[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12418
_____

D.C. Docket No. 1:16-cv-00395-TFM-MU

THAI MEDITATION ASSOCIATION OF ALABAMA, INC.,
SIVAPORN NIMITYONGSKUL,
VARIN NIMITYONGSKUL,
SERENA NIMITYONGSKUL,
PRASIT NIMITYONGSKUL,

Plaintiffs - Appellants,

versus

CITY OF MOBILE, ALABAMA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(November 16, 2020)

Before NEWSOM and BRANCH, Circuit Judges, and RAY,* District Judge.

NEWSOM, Circuit Judge:

Four individuals who incorporated the Thai Meditation Association of Alabama, Inc., applied for zoning permits to construct a Buddhist meditation and retreat center in a residential area of Mobile.  Following expressions of intense public opposition, the City denied the applications.  The Association and its incorporators sued, alleging violations of the Free Exercise and Equal Protection Clauses of the United States Constitution, several provisions of the federal Religious Land Use and Institutionalized Persons Act, the Alabama Constitution, and state common-law principles.  The district court rejected all of the plaintiffs' claims.

Because we conclude that the district court erred in its analysis of the plaintiffs' claims under the Free Exercise Clause, RLUIPA's substantial-burden provision, and the Alabama Constitution, we vacate in part and remand for further proceedings.  We affirm the district court's rejection of the plaintiffs' remaining claims.

---

*Honorable William M. Ray II, United States District Judge for the Northern District of Georgia, sitting by designation.

2

**I**

**A**

Mobile's zoning ordinance divides the city into 15 different types of districts, specifying for each the uses permitted "by right" and those requiring "planning approval."   A "church or religious facility" is permitted by right in all business districts but needs planning approval to locate in a residential district. Accordingly, before locating in a residential district, a church or religious facility must obtain permission from the City's Planning Commission, which is tasked with determining whether the facility would be appropriate to the area.

Thai Meditation Association is an organization affiliated with the Dhammakaya school of Buddhism, a sect of Theravada Buddhism headquartered in Thailand.  The Association's purpose is "teaching and research into growth and development of mind and spirit through meditation" and "expand[ing] the knowledge of Buddhism."  Its adherents engage in prayer, meditation, various religious ceremonies, and lectures.  The Association hosts weekly meditation classes that include discussions of Buddhist scriptures and morality.

The Association began operating in 2007 out of a home in Mobile.  When a neighbor complained that a meditation center wasn't permitted by right in a residential zone, the plaintiffs applied for the necessary planning approval.  After encountering stiff community opposition, though, the Planning Commission

3

recommended denial of the plaintiffs' request. In 2009, the Association relocated to a shopping center in a business district where it didn't need special zoning permission. The move, though, brought difficulties. The plaintiffs contend that the shopping-center location impedes their religious exercise in several ways— among others, they say, the traffic noise from the busy street interferes with meditation, the building is too small to accommodate classes and lectures, and the facility provides no place to host visiting monks for overnight retreats.

In an effort to alleviate these difficulties, the plaintiffs searched for another property on which to build a properly equipped meditation center. In 2015, they located—and ultimately purchased—a 6.72-acre property on Eloong Drive. Like their original location, the Eloong Drive property is in a residential district— meaning that the plaintiffs needed planning approval before they could begin construction.[1] Accordingly, after purchasing the parcel—and the 5,000-square-foot home situated on it—the plaintiffs submitted planning-approval applications to construct a 2,400-square-foot meditation building, a 2,000-square-foot cottage to

---

[1] Before purchasing the Eloong Drive property, the plaintiffs attended a predevelopment meeting with their attorney and two city planners to discuss the possibility of relocating the meditation center. The meeting's purpose was to enable the City to gather information about proposed uses of the property and to educate the plaintiffs about the process for obtaining any necessary approvals. As relevant to this appeal, the plaintiffs assert that the city planners told them during the meeting that the meditation center would be treated as a religious facility for zoning purposes. The City disagrees and further emphasizes that although the plaintiffs originally made their purchase of the Eloong Drive property contingent on a determination that they had a right to construct a meditation building and guest houses for monks, they removed these contingencies before closing the sale.

host visiting monks, a 600-square-foot restroom facility, and associated parking. When the plaintiffs' applications went before the Planning Commission, they were met with strong community opposition. Some opponents emphasized traffic and environmental concerns. Others were (to put it charitably) less charitable. During one community meeting, for instance, attendees were "screaming and yelling," "a man was crying, saying that he was Christian [and that] this is unacceptable," and local residents said things like "We don't want Buddhism" and "This is not a church, this is a Buddhist temple, and we don't need that."

Residents separately questioned whether the plaintiffs' proposed use of the property was even religious—or whether, in fact, it envisioned a commercial venture (similar to a yoga studio) that would be prohibited in a residential district. The uncertainty surrounding the religious status of the Association's operations resulted, at least in part, from the Association's sometime description of itself (in promotional materials and elsewhere) as a "non-religious" organization. The plaintiffs explain that, in context, the "non-religious" descriptor meant only that the Association is "open to all" and "does not require rejection of the particular theistic concepts that are central to Judeo-Christian notions of what is meant by 'religion.'" In any event, the Association's religious-ness was questioned throughout the zoning-application process, and the plaintiffs were required to submit documentation to verify the Association's religious bona fides—which, they say,

the City had never required of a church. In the end, though, when the Planning Commission ultimately considered the plaintiffs' applications, it was urged to, and seemingly did, apply the zoning standards pertinent to "church[es] or religious facilit[ies]."

Citing concerns about site access, traffic, and compatibility with the neighborhood, the Planning Commission unanimously denied the plaintiffs' applications. The plaintiffs appealed to the City Council, which upheld the Planning Commission's decision following extensive discussion of both the Association's religious status and its neighborhood compatibility.

## B

The plaintiffs subsequently filed this lawsuit in federal court, alleging that the City's denial of their applications violated (1) RLUIPA's substantial-burden provision, 42 U.S.C. § 2000cc(a)(1); (2) RLUIPA's nondiscrimination provision, 42 U.S.C. § 2000cc(b)(2); (3) RLUIPA's equal-terms provision, 42 U.S.C. § 2000cc(b)(1)[2]; (4) the First Amendment's Free Exercise Clause; (5) the Fourteenth

---

[2] The plaintiffs originally brought the three RLUIPA claims as both facial and as-applied challenges, but the district court granted the City's motion to dismiss the facial components of those counts, so all that remains on appeal are the as-applied aspects of the RLUIPA claims.

Amendment's Equal Protection Clause; (6) the Alabama Constitution; and (7) common-law principles forbidding negligent misrepresentations.

The parties filed dueling summary-judgment motions. The district court granted the City's motion with respect to the plaintiffs' claims under RLUIPA's substantial-burden and equal-terms provisions, the Free Exercise Clause, and the Alabama Constitution. Following a bench trial, the district court rejected the plaintiffs' claims under RLUIPA's nondiscrimination provision, the Equal Protection Clause, and the common law.

This is the plaintiffs' appeal.[3]

## II

On appeal, the plaintiffs contest each of the district court's adverse rulings. In particular, they contend that the district court erred in the following ways: (1) holding that the City's actions didn't substantially burden their religious exercise in

---

[3] We review "a district court's grant of summary judgment *de novo*, applying the same legal standards used by the district court." *Seff v. Broward Cnty., Fla.*, 691 F.3d 1221, 1222 (11th Cir. 2012) (citation omitted). "In deciding whether a material disputed fact precludes summary judgment, a court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (internal quotation marks and citation omitted).

The district court's findings regarding discriminatory intent—for purposes of the plaintiffs' claims under RLUIPA's nondiscrimination provision and the Equal Protection Clause—are governed by the deferential clear-error standard. *See Pullman-Standard v. Swint*, 456 U.S. 273, 290 (1982); *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018). The court's rejection of the plaintiffs' negligent-misrepresentation claim is subject to clear-error review to the extent it turns on factual findings and *de novo* review to the extent it turns on conclusions of law. *See Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008).

violation of RLUIPA and the Free Exercise Clause—specifically, they say, by misapplying the standard for determining what constitutes a "substantial burden"; (2) concluding that the plaintiffs failed to offer a similarly situated "comparator," necessary to their RLUIPA-based equal-terms claim; (3) misapplying the factors relevant to determining whether the City acted with discriminatory intent, as required for their claims under RLUIPA's nondiscrimination provision and the Equal Protection Clause; (4) misinterpreting the Alabama Constitution—in particular, the Alabama Religious Freedom Amendment—to require that a burden on religious exercise be "substantial" despite that term's absence from the provision's text; and (5) misapplying Alabama law in rejecting their negligent-misrepresentation claim.

We will first address the plaintiffs' federal-law claims, and then turn our attention to those arising under state law.

## A

Among the plaintiffs' federal claims, the parties focus principally on those arising under RLUIPA's substantial-burden provision and the Free Exercise Clause. We will begin there, as well.

## 1

### a

RLUIPA's substantial-burden provision states as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a *substantial burden* on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1) (emphasis added).

The parties here agree that our decision in *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004), sets out the governing standard for determining whether government action constitutes a "substantial burden" within the meaning of § 2000cc(a)(1).[4] They disagree vigorously, however, about how to read *Midrash* and whether the district court properly applied it here.

Before jumping into the meat of the substantial-burden issue, a threshold question: Are the plaintiffs here engaged in "religious exercise" within the meaning of RLUIPA? We think it clear that they are. Under the statute, "the term

---

[4] Happily for us, the parties also agree (on appeal, anyway) that one of RLUIPA's jurisdictional "hooks" is satisfied—in particular, that the alleged burden here was "imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). The City regulates land use through its zoning ordinance, which, as explained, allows churches and religious facilities in business districts "by right" but requires "planning approval" to locate in certain residential districts, such as the one at issue here. The planning-approval process requires the City to determine whether a proposed use is appropriate to a particular district by examining an applicant's specific proposal—*i.e.*, by considering, among other things, transportation, traffic, parking, access, public utilities, and facilities. These planning-approval standards ultimately result in a case-by-case evaluation of each applicant's proposal—in the statute's words, an "individualized assessment[] of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).

'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Even more closely on point here, RLUIPA expressly defines "[t]he use, building, or conversion of real property for the purpose of religious exercise" to constitute "religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7)(B). We thus have no difficulty agreeing with the district court that the plaintiffs' "building a center with the alleged purpose of teaching Dhammakaya meditation falls squarely within RLUIPA's definition of 'religious exercise.'"

So then, on to the main event: Did the City's denial of the plaintiffs' zoning applications impose a "substantial burden" on their religious exercise as that term is used in RLUIPA and explained in *Midrash*? Well, maybe. What we know for certain is that in holding that the plaintiffs had *not* demonstrated a substantial burden, the district court misapplied the standard that we established in *Midrash*. Rather than forging ahead to answer the substantial-burden question ourselves in the first instance, we will correct the district court's error and remand for a fresh determination under the proper standard. Let us explain.

In *Midrash*, we held that a zoning ordinance excluding churches and synagogues from a business district that allowed private clubs and lodges didn't violate RLUIPA's substantial-burden provision. 366 F.3d at 1228. The two

10

synagogues involved in that case argued that because Orthodox Judaism forbids adherents to use cars or other means of transportation during the weekly Sabbath, requiring the synagogues to relocate to a permitted district would put them "out of the required walking range for a significant number of their members, particularly elderly ones," and thus substantially burden their religious exercise. *Id.* at 1221. We disagreed. "While walking may be burdensome and 'walking farther' may be even more so," we held, "we cannot say that walking a few extra blocks is 'substantial,' as that term is used in RLUIPA." *Id*. at 1228.

More important than our specific holding in *Midrash*—at least for purposes of our decision today—was the way we explained the term "substantial burden." In doing so, we made several important observations. First, we emphasized that because RLUIPA doesn't define "substantial burden," it must be given "its ordinary or natural meaning." *Id*. at 1226. Second, we said that preexisting Free Exercise Clause precedent is "instructive in determining what Congress understood 'substantial burden' to mean in RLUIPA." *Id*. On the one hand, we noted that we had previously held "that an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Id*. at 1227 (citing *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995)). On the other hand, we clarified that a substantial burden

11

"requires something more than an incidental effect on religious exercise." *Id*. Looking to "[t]he combined import of these articulations," we concluded that "a 'substantial burden' must place more than an inconvenience on religious exercise," that "a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly," and that "a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id*.

The plaintiffs in this case contend that the City's denial of their zoning applications substantially burdens their religious exercise because, they say, at the Association's current location, the traffic noise interferes with meditation, the building is too small to accommodate classes and lectures, and there is no place to host visiting monks for overnight retreats. The district court rejected the plaintiffs' contention. In so doing, though, the court misread *Midrash* and thus misapplied RLUIPA's substantial-burden provision.

Quoting one passage from *Midrash*, the district court observed that, "an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity or if the regulation requires participation in an activity prohibited by religion." Dist. Ct. Order at 24 (quoting *Midrash*, 366 F.3d at 1227). Then, after analyzing both parties' arguments, the district court concluded that the plaintiffs had failed to

meet "the binding Eleventh Circuit[] standard"—which, echoing another *Midrash* passage, the court described as "whether Defendant has imposed pressure so significant as to require Plaintiffs to forego their religious beliefs." *Id*. at 36.

We see two problems.  First, the district court's articulation of the substantial-burden standard—that, to qualify, a regulation must "completely prevent[]" religious activity or "tend[] to force adherents to forego religious precepts"—defies the "ordinary [and] natural meaning" of the term "substantial." *Midrash*, 366 F.3d at 1226.  Whatever "substantial" means, it most assuredly does *not* mean complete, total, or insuperable.  *See Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 96 (1st Cir. 2013) (observing that "[a] burden does not need to be disabling to be substantial"); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (explaining that "a burden need not be found insuperable to be held substantial").

Second, the district court misread our opinion in *Midrash*.  We didn't say there that to count as a "substantial burden" government conduct must "completely prevent[]" religious exercise.  Nor did we say (as the district court here paraphrased) that government conduct must "impose[] pressure so significant as to require Plaintiffs to forego their religious beliefs."  To be sure, the "completely prevents" and "force . . . to forego" passages that the district court invoked appear in the *Midrash* opinion.  But they appear only as examples of the sort of conduct

13

that clearly satisfies the substantial-burden standard—not as the standard itself.  In the course of fleshing out the substantial-burden standard, we described bookend examples of conduct that plainly would and wouldn't meet it.  At one end of the spectrum, we explained that a mere "incidental effect" or "inconvenience" on religious exercise doesn't constitute a substantial burden.  366 F.3d at 1227.  At the other end, we said that "a substantial burden *can* result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id.* (emphasis added).  This latter form of conduct, our decision made clear, is *sufficient* to demonstrate a substantial burden—but it is not, contrary to the district court's assumption here, *necessary*.  The same holds for *Midrash*'s "completely prevents" passage:  All we said there—unremarkably—was that "[w]e have held that an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity . . . ." *Id*.  Again, a sufficient—but not necessary—basis for demonstrating a substantial burden. *Id.*

The closest *Midrash* came to articulating a necessary condition—a baseline standard—was its observation that "a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior . . . ." *Id*.  And indeed, other circuits considering RLUIPA's substantial-burden provision have invoked *Midrash* in holding that a substantial burden exists

14

when government action coerces or pressures religious adherents to "change [their] behavior," even if that coercion or pressure isn't so extreme as to require them to forgo their beliefs completely. *Westchester Day Sch.*, 504 F.3d at 349 (defining substantial burden as "government action that directly coerces the religious institution to *change its behavior*, rather than government action that forces the religious entity to choose between religious precepts and government benefits") (emphasis added) (citing *Midrash*, 366 F.3d at 1227); *see also Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 556 (4th Cir. 2013) (explaining that "a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to *modify its behavior*") (emphasis added) (citing *Midrash*, 366 F.3d at 1227).

To summarize, then, the district court here just latched onto the wrong language in *Midrash*. Under our decision there, "a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior . . . ." *Midrash,* 366 F.3d at 1227. The "completely prevents" and "force . . . to forego" passages simply describe conduct that would (unlike an "incidental effect" or mere "inconvenience") suffice to demonstrate a substantial burden. Accordingly, it isn't necessary for a plaintiff to prove—as the district court here seemed to assume—that the government required her to completely

15

surrender her religious beliefs; modified behavior, if the result of government coercion or pressure, can be enough.

Rather than apply *Midrash*'s proper standard to the plaintiffs' substantial-burden claim ourselves, we will vacate and remand for the district court to do so in the first instance. In determining whether the City's denial of the plaintiffs' zoning applications was "akin to significant pressure which directly coerce[d the plaintiffs] to conform [their] behavior," the district court should consider, among others, the following factors:

- whether the plaintiffs have demonstrated a genuine need for new or more space—for instance, to accommodate a growing congregation[5] or to facilitate additional services or programming[6];

- the extent to which the City's decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise[7];

---

[5] *See Bethel World Outreach*, 706 F.3d at 558 (finding a substantial burden where insufficient space to accommodate a large congregation caused the church to have multiple, shorter services, thereby interfering with Communion and cutting short the church's "Altar Call" practice); *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 898–901 (7th Cir. 2005); *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011); *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 188–90 (2d Cir. 2014).

[6] *See, e.g.*, *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cty.*, 915 F.3d 256, 261 (4th Cir. 2019) (observing that a burden is "usually" substantial where "where use of the property would serve an unmet religious need"), *see also Bethel World Outreach*, 706 F.3d at 552, 558 (providing educational programs and counseling at a church); *Westchester Day Sch.*, 504 F.3d at 347–48, 352 (expanding the offerings at a religious school).

[7] *See, e.g.*, *Bethel World Outreach*, 706 F.3d at 557–58 (observing that a substantial burden may exist "even though other suitable properties might be available, because the 'delay, uncertainty, and expense' of selling the current property and finding a new one are themselves burdensome" (quoting *Sts. Constantine & Helen*, 396 F.3d at 899–901); *Westchester Day Sch.*, 504 F.3d at 352 (considering whether the applicant has "quick, reliable, and financially feasible alternatives . . .

- whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise[8];

- whether the City's decisionmaking process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around[9];

- whether the City's denial of the plaintiffs' zoning applications was final or whether, instead, the plaintiffs had (or have) an opportunity to submit modified applications that might satisfy the City's objections[10]; and

- whether the alleged burden is properly attributable to the government (as where, for instance, a plaintiff had a reasonable expectation of using its property for religious exercise[11]) or whether the burden is instead self-imposed (as where the plaintiff had no such expectation or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements[12]).

---

to meet its religious needs absent its obtaining the construction permit").

[8] *See, e.g., Westchester Day Sch.*, 504 F.3d at 349 ("There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise.").

[9] *See, e.g.*, *Westchester Day Sch.*, 504 F.3d at 352 (emphasizing that a zoning board's decisionmaking was characterized by "an arbitrary blindness to the facts"); *Roman Catholic Bishop of Springfield*, 724 F.3d at 96–97 (observing that evidence that "regulators disregard[ed] objective criteria and instead act[ed] adversely to a religious organization based on the objections of a 'small but influential' group in the community" counsels in favor of finding a substantial burden (quoting *Westchester Day Sch.*, 504 F.3d at 346)).

[10] *See, e.g.*, *Westchester Day Sch.*, 504 F.3d at 349 ("[W]hether the denial of the application was absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on [a plaintiff] to change its behavior."); *see also Bethel World Outreach*, 706 F.3d at 558 (emphasizing that whether the denial is conditional or absolute is a factor to consider in the substantial-burden analysis).

[11] *See, e.g.*, *Jesus Christ is the Answer Ministries*, 915 F.3d at 261; *Bethel World Outreach*, 706 F.3d at 557.

[12] *See, e.g.*, *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 989–990 (9th Cir. 2006); *see also Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 515 (4th Cir. 2016); *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1004 (6th Cir. 2017); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007).

17

If, based on such considerations, the district court concludes that the plaintiffs have demonstrated that the City's zoning decisions substantially burdened their religious exercise, it must then proceed to determine whether the City's conduct satisfies strict scrutiny. *See* 42 U.S.C. § 2000cc(a)(1). It would be premature for us to consider that issue now.

**b**

The plaintiffs also (and relatedly) contend that the City's denial of their zoning applications violated the First Amendment's Free Exercise Clause. That Clause—which applies to states and localities through the Fourteenth Amendment—provides that "Congress shall make no law . . . prohibiting the free exercise of religion." U.S. Const. amend. I.

The district court rejected the plaintiffs' Free Exercise Clause claim on summary judgment. Rather, though, than independently evaluating the free-exercise issue, the court simply cross-referenced its analysis of the plaintiffs' substantial-burden claim under RLUIPA, concluding (1) that "the burdens Plaintiffs experience are nothing more than inconveniences incidental to [the City's] denial of their [a]pplications," and (2) that the City's denial "does not restrict Plaintiffs' current religious practice but, rather, prevents a change in their religious practice." Because the district court expressly tethered its rejection of the plaintiffs' claim under the Free Exercise Clause to its treatment of their substantial-

18

burden claim under RLUIPA, we will vacate and remand the free-exercise claim for reconsideration alongside the substantial-burden claim.

**2**

The plaintiffs separately argue that the City's rejection of their applications violated RLUIPA's equal-terms provision, which states that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). To be sure, Mobile's zoning ordinance doesn't single out churches and religious organizations for unfavorable treatment; rather, it lumps them in with other non-religious entities in requiring planning approval for projects in residential districts. Nonetheless, we have held that even "a truly neutral statute" can violate RLUIPA's equal-terms provision if, as relevant here, it "is selectively enforced against religious, as opposed to nonreligious, assemblies or institutions." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1308 (11th Cir. 2006). In order to prove an as-applied equal-terms claim, a plaintiff "must present evidence that a similarly situated nonreligious comparator received differential treatment under the challenged regulation." *Id.* at 1311 (emphasis omitted). "If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less

than equal treatment, and the plaintiff has failed to meet its initial burden of proof."
*Id.*

Here, in an argument that can most charitably be described as summary—occupying as it does only a single paragraph in their opening brief—the plaintiffs assert that they were treated less favorably than The Alba Fishing and Hunting Club, which they assert is a valid comparator.

Even though Alba is located in the same basic vicinity as the plaintiffs' Eloong Drive property, the district court rejected it as a valid comparator for two reasons. First, the court explained that unlike the plaintiffs here, Alba "was not seeking to put its property to a *new* use" but, rather, sought permission to expand its long-time use of the same parcel as a recreational club. In particular, Alba sought planning approval "to allow the expansion of an existing recreation club," to replace a portion of its clubhouse damaged by Hurricane Katrina, and to add a meeting hall to the site. Second, and relatedly, the court emphasized that Alba was not a new entrant into the neighborhood but, rather, "ha[d] been associated with [its current] location since 1921, before the area was incorporated into the City of Mobile."

We agree with the district court that those two features suffice to distinguish Alba for comparator purposes. Although both Alba and the plaintiffs here sought planning approval for special use in a single-family residential district, they did so

20

for different reasons—Alba to repair and expand an existing club, and the plaintiffs here to construct an entirely new facility. It seems to us clear that repairing and expanding an existing facility differs from building an entirely new structure on (and introducing an entirely new use of) a piece of property: In the former situation, the applicant has a reasonable expectation that its preexisting use was—and remains—acceptable to and harmonious with the surrounding area, whereas the applicant in the latter situation does not. That is especially true here, where Alba's ownership and use of its property dates to a time before it was incorporated into Mobile, and thus necessarily to a time when it wasn't even subject to the presently prevailing zoning restrictions. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 196–98 (2d Cir. 2014) (concluding that a library was not a proper comparator for religious organization's RLUIPA equal-terms claim in part because its expansion was approved 50 years earlier "pursuant to a different land use regime").

Because of these material distinctions between the two organizations, the plaintiffs have shown only that they "received *different* treatment, not *unequal* treatment," which isn't enough. *Primera*, 450 F.3d at 1313. We therefore affirm the district court's rejection of the plaintiffs' equal-terms claim.

**3**

Rounding out their federal claims, the plaintiffs contend that the City discriminated against them on the basis of religion in violation of RLUIPA's nondiscrimination provision and the Fourteenth Amendment's Equal Protection Clause. The former states that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," 42 U.S.C. § 2000cc(b)(2), and the latter provides that "[n]o State shall . . . deny any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1.

The district court allowed the plaintiffs' nondiscrimination and equal-protection claims to proceed beyond summary judgment but ultimately rejected both following a bench trial. In so doing, the court analyzed the two claims together, reasoning that the governing legal standards are "nearly identical." As relevant here, the district court concluded that the plaintiffs hadn't demonstrated—based on the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)—that the City officials who had rejected their applications were motivated by discriminatory intent.[13]

---

[13] The district court separately held that the plaintiffs had failed to identify a similarly situated religious institution to serve as a comparator for their RLUIPA-based nondiscrimination claim. On appeal, the plaintiffs contend that RLUIPA doesn't require a comparator for nondiscrimination claims. We needn't address that issue, because even if we were to assume that a comparator isn't required, we would affirm the rejection of the plaintiffs' nondiscrimination and equal-protection claims on the ground, explained in text, that they haven't

The plaintiffs agree that "[d]iscriminatory intent must be proven for both" their nondiscrimination and equal-protection claims—they simply contend that the evidence adduced at trial sufficed to show it. *See* Br. of Appellant at 35. But because the district court ruled against them following a bench trial, the plaintiffs have a steep hill to climb on appeal. As we have recently reiterated, we review a district court's findings concerning the existence—or absence—of discriminatory intent only for clear error. *See Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018). Under that deferential standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even [if] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (citations and quotations omitted).

In *Arlington Heights*, the Supreme Court provided a list of considerations that bear on the question whether discriminatory intent was a "motivating factor" in an allegedly discriminatory decision. 429 U.S. at 265–66. A reviewing court may consider, for instance, (1) any disproportionate "impact" caused by the decision, (2) the decision's "historical background," (3) the "specific sequence of events leading up" to the decision, (4) "departures from the normal"

---

shown that the district court clearly erred in finding a lack of discriminatory intent.

23

decisionmaking process, and (5) any "legislative or administrative history" in the form of contemporary statements by the decisionmakers. *Id.* at 266–68.

Drawing principally on the historical-background and legislative-history factors, the plaintiffs here emphasize that there was strong community opposition to the meditation center's location in a residential district and that City officials "respon[ded]" to that opposition by rejecting the zoning applications. And indeed, the record is replete with evidence that could reasonably be understood as reflecting local residents' anti-Buddhist sentiment. A sampling of residents' statements from a November 2015 community meeting concerning the plaintiffs' proposal is illustrative. Witnesses testified, for instance, that—

- "a man was crying, saying that he was Christian [and that] this is unacceptable";

- "[o]ne person stood up and said: 'Oh, so you're bringing a big Buddhist congregation into the area, are you?'";

- another said, "[w]e don't want Buddhism";

- one objected, "[t]his is not a church, this is a Buddhist temple, and we don't need that"; and

- another complained, "[w]e don't need [Buddhism]—this is not a Buddhist neighborhood."

It's not enough, though, for the plaintiffs to show that community members opposed their applications on prohibited grounds—they must prove that the city officials who rejected them acted with discriminatory intent. And we cannot

24

attribute the residents' purported bias to city officials absent at least some proof

that the officials "ratified" it.  *See Hallmark Devs., Inc. v. Fulton Cnty., Ga.,* 466

F.3d 1276, 1285 (11th Cir. 2006).  The closest, it seems, that the plaintiffs can get

to hard evidence that any city official harbored discriminatory intent is the

following remark by the City's attorney:  "This is not a religious facility.  The

application was for Meditation Center of Alabama or whatever.  This is not the

Baptist church or the Episcopal church."  But even that statement isn't sufficient

because the fate of the plaintiffs' applications rested in the hands of the Planning

Commission and the City Council, and we have held that we won't impute the

discriminatory intent of one or a few decisionmakers to the entire group—let alone,

as here, of a subordinate *non*-decisionmaker to the final decisionmakers.  *See*

*Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297–98 (11th Cir. 2002).

The plaintiffs separately emphasize *Arlington Heights*' sequence-of-events

and departure-from-the-normal-process factors, arguing that "[n]o other church

applicant has ever had to prove that it was sufficiently 'religious.'"  Br. of

Appellant at 41.  We see two problems.  First, the plaintiffs fail to recognize that

what they call "the religious issue"—*i.e.*, the need to determine whether the center

was indeed a "religious facility" within the meaning of the City's zoning code—

arose, as the district court found, because the Association had in the past repeatedly

referred to itself as a "non-religious organization" and to meditation as a

"nonreligious . . . technique." To be sure, the plaintiffs insist that those descriptors meant only that the Association is "open to all" and "does not require rejection of the particular theistic concepts that are central to Judeo-Christian notions of what is meant by 'religion.'" Be that as it may, the uncertainty caused by the Association's own marketing tends to undercut the inference that requiring it to demonstrate its own religious-ness bespeaks discrimination. Second, and separately, whatever confusion initially attended "the religious issue," the evidence indicates (1) that the plaintiffs' counsel, the Planning Commission's lawyer, and the Planning Commission's chairman *all* urged the Commission to judge the plaintiffs' applications by the criteria applicable to "religious facilit[ies]," and (2) that the Commission did so.

In sum, having reviewed the relevant record evidence, we simply cannot conclude that the district court committed clear error in finding that the plaintiffs failed to prove that a majority of the members of either the Planning Commission or the City Council acted with an intent to discriminate against them on the basis of religion. Accordingly, we affirm the district court's rejection of the plaintiffs' claims under RLUIPA's nondiscrimination provision and the Equal Protection Clause.

\* \* \*

26

To recap our decisions concerning the plaintiffs' federal claims—before addressing those arising under state law—we hold that the district court applied the wrong standard in evaluating the plaintiffs' claims under RLUIPA's substantial-burden provision and the Free Exercise Clause, and that the court should reconsider those claims on remand under the proper standard, but that the district court properly rejected the plaintiffs' claims under RLUIPA's equal-terms and nondiscrimination provisions and the Equal Protection Clause.

**B**

We turn, then, to the plaintiffs' state-law claims.  The plaintiffs contend that the City's denial of their zoning applications (1) violated the Alabama Constitution—in particular, the Alabama Religious Freedom Amendment—and (2) constituted common-law negligent misrepresentation.  The district court rejected both contentions—the first on summary judgment, the second following a bench trial.  We will review them in turn.

**1**

The Alabama Religious Freedom Amendment was ratified in 1998 and is now codified at § 3.01 of the Alabama Constitution.  In relevant part, ARFA's operative provision states as follows:

> (a) Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

27

(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:

    (1) is in furtherance of a compelling governmental interest; and

    (2) is the least restrictive means of furthering that compelling interest.

Ala. Const. Art. I, § 3.01(V). The plaintiffs emphasize that ARFA's text—unlike RLUIPA's—doesn't require proof that the government "substantially" burdened religious exercise, only that it "burden[ed]" it. Thus, they insist, the Alabama Constitution requires strict scrutiny of *any* burden on religious exercise, even if that burden is *in*substantial.

The district court disagreed. It "interpret[ed] ARFA in light of the case law decided under RLUIPA" and thus came to "the same conclusion [it] reached in Plaintiffs' federal Substantial Burden claim:  Plaintiffs' claim would be unsuccessful." Importantly for present purposes, the district court expressly "refuse[d] to hold a government violates ARFA when its actions incidentally"—rather than substantially—"burden a plaintiff's religious exercise."  "To hold that 'any' burden includes those that are minimal, insignificant, or incidental," the court held, would be "to adopt an interpretation that runs afoul of the judiciary's efforts in controlling the floodgates of litigation."

The plaintiffs' ARFA claim thus tees up an important and sensitive question of state law:  Is the Alabama Constitution markedly more protective of religious

28

exercise than federal law in that it requires a plaintiff to show, as prerequisite to the application of strict scrutiny, *only* that government action "burdened"—rather than "substantially burdened"—his religious exercise?

Before rushing headlong into that state-law briar patch, a word about the possibility of certifying this question to the Alabama Supreme Court: Certification, frankly, was our preference—so much so, in fact, that, having raised the issue with the parties at oral argument, we directed them to file supplemental briefs addressing the possibility. This, after all, strikes us as precisely the sort of question that a state court *should* definitively resolve: It is purely legal, it implicates fundamental constitutional and public-policy interests, and it is unsettled—as the district court observed, "there is little to no Alabama case law providing guidance on what [ARFA] means." Regrettably, though, we have concluded that the question doesn't satisfy the certification standard under Alabama Rule of Appellate Procedure 18. In relevant part, that rule states that a federal court may certify a question when three conditions are met: (1) the question is one concerning the "law of this State" (*i.e.*, Alabama); (2) the question is "determinative of said cause"; and (3) "there are no clear controlling precedents" from the Alabama Supreme Court. Ala. R. App. P. 18(a).

While we are convinced that the question whether ARFA requires a plaintiff to show only that the government has "burdened" (rather than "substantially

29

burdened") religious exercise meets the first and third conditions, we are equally convinced that it doesn't meet the second. The phrase "determinative of said cause" is hardly self-defining. (In fact, it's downright opaque—for instance, there isn't even an earlier "cause" to which the phrase refers, as the adjective "said" would suggest.) As other courts interpreting similar provisions have observed, though, the phrase could be understood in any of several ways—*e.g.*, determinative of the entire case as to all parties, determinative of the case with respect to one party or group of parties, determinative of a single identifiable claim, or (perhaps) determinative of a key legal issue. *See, e.g.*, *Volvo Cars of N. Am., Inc. v. Ricci*, 137 P.3d 1161, 1163–64 (Nev. 2006) (comparing competing interpretations of the phrase "determinative of [the] cause" in state certification provisions); *see also* 17A Wright & Miller, *Fed. Prac. & Proc.* § 4248 (3d ed. 2020) (same).

Here, it seems clear that none of the first three possibilities is satisfied. Not only is the "burden" question not determinative of the entire case, it's not even determinative of the plaintiffs' ARFA claim. No matter how the burden question comes out, either party could ultimately go on to prevail on the merits. Even if the plaintiffs are correct that a mere (*i.e.*, insubstantial) burden is sufficient to trigger ARFA's protections, the City could still (at least theoretically) win by surviving strict scrutiny. And even if the City is right that a substantial burden is required, the plaintiffs could nonetheless win by showing that the City's zoning decisions

30

constitute a substantial burden and don't satisfy strict scrutiny. Either way—however the burden question is answered—there's more work to be done to decide how the plaintiffs' ARFA claim should be resolved. Accordingly, we must conclude that the burden question isn't "determinative" of either the entire case or even of the plaintiffs' ARFA claim.

So among the possible interpretations of the phrase "determinative of said cause," the only one that the burden question could satisfy is "determinative of [a key issue]" (or the like). Unfortunately, we don't think that "determinative of said cause" can be read so broadly. First, and most obviously, doing so just stretches the ordinary meaning of the word "cause" too far. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) (defining "cause," in relevant part, to mean "[a] lawsuit; a case"). Second, we find it significant that (1) many states modeled their certification provisions on a 1967 uniform act that permitted certification of questions that "may be determinative of the cause,"[14] (2) in 1995 the uniform-act drafters "substantially broadened the provision's scope by altering the language to permit certification when a question's answer 'may be determinative of an issue in pending litigation,'"[15] (3) multiple states have adopted the 1995 act's "issue"-based framing, but (4) Alabama has *not* (yet) followed suit.

---

[14] Unif. Certification of Questions of Law Act (1967 Act) § 1, 12 U.L.A. 86 (1996) (amended 1995).

[15] *Volvo*, 137 P.3d at 1164 n.2; *see also* Unif. Certification of Questions of Law Act (1995 Act) §

31

So alas, it seems that the certification option is off the table—and it thus falls to us to interpret ARFA for ourselves. Two cardinal rules of construction convince us that the plaintiffs' "burden-only" reading is the better one. First, under Alabama law—as in the law more generally—the words employed in a written provision "must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." *IMED Corp. v. Sys. Eng'g Assocs. Corp.*, 602 So. 2d 344, 346 (Ala. 1992); *accord, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: An Interpretation of Legal Texts* 56, 69 (2012). Second, under Alabama law—again, as in the law more generally—a court "cannot supply words purposely omitted." *State v. Calumet & Hecla Consol. Copper Co.*, 66 So. 2d 726, 729 (Ala. 1953); *accord, e.g.*, *Pace v. Armstrong World Indus., Inc.*, 578 So. 2d 281, 284 – 85 (Ala. 1991) ("[G]enerally courts may neither insert words in the statute . . . ."); Scalia & Garner, *supra*, at 93.

ARFA is perfectly clear both in what it says and in what it doesn't. First, what it says: ARFA repeatedly states that, except in extraordinary circumstances, the government may not "burden" religious exercise. In its "findings" section, ARFA provides that "[g]overnments should not *burden* religious exercise without

---

3, 12 U.L.A. 73 (1996 & Supp. 2006).

32

compelling justification."  Ala. Const. Art. I, § 3.01(II)(3) (emphasis added).  So too, in its "purpose" section, ARFA declares its objective "to guarantee that the freedom of religion is not *burdened* by state and local law" and to provide a claim or defense to those whose "religious freedom is *burdened* by government."  *Id*. § 3.01(III) (emphasis added).  Finally, and most importantly, ARFA's operative provision states (1) that, as a general matter, "[g]overnment shall not *burden* a person's freedom of religion even if the burden results from a rule of general applicability" and (2) that "[g]overnment may *burden* a person's freedom of religion only if" it satisfies the traditional strict-scrutiny standard.  *Id*. § 3.01(V)(a)–(b) (emphasis added).

So what *doesn't* ARFA say?  It never once uses the phrase "substantial burden."  And given the historical backdrop against which ARFA was adopted, the absence of the term "substantial" is so conspicuous that we can only conclude that its omission was intentional.  In 1997, the U.S. Supreme Court invalidated RLUIPA's predecessor, the federal Religious Freedom Restoration Act—at least insofar as it applied to the states—in *City of Boerne v. Flores*, 521 U.S. 507 (1997).  The very next year, the Alabama Legislature proposed ARFA, and the people of Alabama ratified it as part of the state constitution.  One of the legislative findings underlying ARFA—indeed, the only one that doesn't track RFRA's own findings—makes it clear that ARFA was adopted in response to the Supreme

33

Court's decision in *Boerne*, and to fill a void left by RFRA's invalidation:

"Congress passed the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, to establish the compelling interest test set forth in prior federal court rulings, but in *City of Boerne v. Flores*, 117 S. Ct. 2157 (1997), the United States Supreme Court held the act unconstitutional stating that the right to regulate was retained by the states." Ala. Const. Art. I, § 3.01(II)(6).

Not surprisingly, therefore, ARFA reads like a carbon copy of the stricken RFRA—with one very notable exception: In *every* place that RFRA employed the term "substantial burden," ARFA uses "burden." The following side-by-side comparison of RFRA and ARFA, we think, speaks for itself, and confirms that the use of the term "burden" in place of the more familiar "substantial burden" was deliberate:

34

| Section | RFRA | ARFA |
|---|---|---|
| **Findings** | The Congress finds that … governments should not ***substantially burden*** religious exercise without compelling justification ….<br><br>42 U.S.C. § 2000bb(a)(3) | The Legislature makes the following findings concerning religious freedom: … Governments should not ***burden*** religious exercise without compelling justification.<br><br>Ala. Const. Art. I, § 3.01(II)(3) |
| **Purposes** | The purposes of this chapter are (1) to restore the compelling interest test … and to guarantee its application in all cases where free exercise of religion is ***substantially burdened***; and (2) to provide a claim or defense to persons whose religious exercise is ***substantially burdened*** by government.<br><br>42 U.S.C. § 2000bb(b)(1)–(2) | The purpose of the Alabama Religious Freedom Amendment is [1] to guarantee that the freedom of religion is not ***burdened*** by state and local law; and [2] to provide a claim or defense to persons whose religious freedom is ***burdened*** by government.<br><br>Ala. Const. Art. I, § 3.01(III) |
| **Operative Provision** | (a) Government shall not ***substantially burden*** a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).<br><br>(b) Government may ***substantially burden*** a person's exercise of religion only if it demonstrates that application of the burden to the person … (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.<br><br>42 U.S.C. § 2000bb-1 | (a) Government shall not ***burden*** a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).<br><br>(b) Government may ***burden*** a person's freedom of religion only if it demonstrates that application of the burden to the person … (1) [i]s in furtherance of a compelling governmental interest; and (2) [i]s the least restrictive means of furthering that compelling governmental interest.<br><br>Ala. Const. Art. I, § 3.01(V) |

Given the post-RFRA context in which ARFA was adopted, and its pointed rejection of the phrase "substantially burden" in favor of "burden" *simpliciter*, we conclude that qualifier's omission was intentional. No matter how tempting it may be—whether to harmonize state and federal law or, as the district court suggested, to "control[] the floodgates of litigation"—we aren't at liberty to graft the adverb "substantially" onto a provision (or set of provisions) that won't accommodate it.

35

Under Alabama law, our job (giving it our best *Erie* guess) is to "interpret

[ARFA's] language to mean exactly what it says." *IMED Corp.*, 602 So. 2d at

346. And what ARFA says is that *any* burden—even an incidental or insubstantial

one—suffices to trigger strict scrutiny.

Accordingly, we vacate the district court's decision rejecting the plaintiffs'

ARFA claim and remand for further proceedings consistent with our interpretation.

**2**

Finally, the plaintiffs briefly contend that the city planners' statement during

the predevelopment meeting that their proposal for the Eloong Drive property

would be treated as a "religious" use for zoning purposes constituted an actionable

negligent misrepresentation under Alabama law. In order to establish a negligent-

misrepresentation claim, a plaintiff must demonstrate "(1) a misrepresentation of

material fact, (2) made willfully to deceive, recklessly, without knowledge, or

mistakenly, (3) which was reasonably relied on by the plaintiff under the

circumstances, and (4) which caused damage as a proximate consequence." *Bryant*

*Bank v. Talmage Kirkland & Co., Inc.*, 155 So. 3d 231, 238 (Ala. 2014) (citations

omitted).

Following the bench trial, the district court found (1) that the city planners

hadn't told the plaintiffs that their meditation center would be treated as a religious

facility, (2) that the plaintiffs hadn't shown that the city planners intended to

36

deceive them, (3) that the plaintiffs had "failed to demonstrate the element of reasonable reliance" because they "conclusively knew" that the final determination rested with the Planning Commission and the City Council, and (4) that the plaintiffs had "failed to demonstrate any damages" because their applications were ultimately considered under the planning-approval criteria applicable to religious facilities. The district court thus found that the plaintiffs had failed to prove every element of their negligent-misrepresentation claim.

On appeal, the plaintiffs take issue with each of the district court's determinations, but they haven't shown any reversible error. With respect to the district court's finding that the planners hadn't told them that their center would be treated as a religious facility, for instance, all the plaintiffs say is that it is contradicted by testimony at trial. But the plaintiffs haven't provided any basis for concluding, as they must, that the district court's no-misrepresentation finding was clearly erroneous. Nor, we conclude, have the plaintiffs provided any good reason for rejecting either of the district court's "in any event" determinations—namely, (1) that the plaintiffs knew that the fate of their applications ultimately rested with the Planning Commission and the City Council, and, thus, that they couldn't have reasonably relied on statements made by city planners during preliminary meetings; and (2) that the plaintiffs' application was ultimately considered under the religious-facility planning-approval criteria anyway, and, thus, that they

37

couldn't prove any damages based on any supposed contrary statement during the pre-planning stages.

Accordingly, we affirm the district court's rejection of the plaintiffs' negligent-misrepresentation claim.

* * *

Recapping our determinations concerning the plaintiffs' state-law claims, we hold that the district court misread the Alabama Religious Freedom Amendment and should reconsider the plaintiffs' ARFA claim under our interpretation, but that the court correctly rejected the plaintiffs' negligent-misrepresentation claim.

## III

For the foregoing reasons, we vacate the district court's decision rejecting the plaintiffs' claims under RLUIPA's substantial-burden provision, the Free Exercise Clause, and the Alabama Religious Freedom Amendment. We affirm the district court's rejection of the plaintiffs' remaining claims.

**VACATED** and **REMANDED** in part and **AFFIRMED** in part.