[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13444

_____

SAILBOAT BEND SOBER LIVING, LLC,
a Florida limited liability company,
CARL BERGSTROM,
an individual,
IRYNA BERGSTROM,
an individual,

Plaintiffs-Appellants,

*versus*

THE CITY OF FORT LAUDERDALE, FLORIDA,
a political subdivision of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-60007-RKA

_____

Before JORDAN, JILL PRYOR, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Sailboat Bend Sober Living, LLC ("Sailboat Bend"), a for-profit sober living home in Fort Lauderdale, Florida, houses up to eleven people recovering from addiction who support each other in their sobriety. But it has had trouble complying with the City of Fort Lauderdale ("the City")'s Building and Fire Codes (collectively, "Codes") and the City's recently enacted Zoning Ordinance.

Sailboat Bend, along with its part-owners Carl and Iryna Bergstrom, have brought several claims under the Fair Housing Act and Amendments ("FHA") and the Americans with Disabilities Act ("ADA") against the City in the Southern District of Florida. Essentially, they allege that the City's code enforcement decisions were motived by hostility to the disabled, their accommodation request was wrongfully denied, and the Zoning Ordinance was facially discriminatory against people with disabilities.

We conclude, as the district court did earlier, that the Zoning Ordinance does not discriminate against the Plaintiffs. Rather, it works to their decided benefit. Moreover, no evidence has been

adduced to show that the City enforced its Codes in a manner that discriminates on the basis of a disability.  Finally, the Plaintiffs' requested accommodation on account of disability was not necessary.

Accordingly, we affirm the entry of final summary judgment for the City on all counts.

## I.

These are the essential facts taken in a light most favorable to Sailboat Bend.  Plaintiff Sailboat Bend is owned, in a fifty-fifty partnership with another family, by Plaintiffs Carl Bergstrom and his wife Iryna Bergstrom.  In March 2008, the Bergstroms purchased the property at 1110 SW 1st Street, Fort Lauderdale, Florida ("Property") for $144,000.  They operate Sailboat Bend as a business that offers housing to people addicted to alcohol and other drugs.  Since the business's inception in 2008, the owners have charged $150 per tenant per week.  The tenants generally pay their rent in cash.  The typical stay lasts no more than a few weeks or months.

At the time of the purchase, the Property was in disarray and the Bergstroms spent three months renovating it.  Throughout the renovations, the Property's basic structure remained the same: a main building comprised of nine bedrooms, two bathrooms, one kitchen, and one living room; and a detached structure comprised of a single bedroom and bathroom.  The Bergstroms claim "full

occupancy" of the Property is eleven tenants, although occupancy rates have fluctuated markedly over the years.

The relationship between the Plaintiffs and the City turned sour in April 2012, when the City investigated a citizen's complaint about the conditions at the Property and, subsequently, commenced two Building Code enforcement actions. The one relevant to this appeal was for "unpermitted work" on the Property, including the installation of a central air conditioning ("AC") unit. Because there was no after-the-fact permit that would render the AC unit compliant with the Building Code, Bergstrom ultimately decided to remove the unit because a new system would have been, in his words, "outrageously expensive."

During this time frame, a Fire Inspector examined the Property and identified several significant code violations that required correction. Most importantly, the report pointed out that the Property's "use" was "under research" to determine which fire code applied, and explained that "[a]fter the use has been defined there will be other fire and life safety requirements that will have to be met[.]" Doc. 54 ¶ 28. There are different "uses" that determine the applicable fire code. The uses are defined in the National Fire Protection Association's Life Safety Code ("Fire Code"), and are incorporated into Florida law. *See* FLA. STAT. § 633.202(2). These are the uses:

> 1) One- and Two-Family Dwellings are defined as "buildings containing not more than two dwelling units in which each dwelling unit is occupied by

members of a single family with not more than three outsiders, if any, accommodated in rented rooms." Fire Code § 24.1.1.2 (2012).

2) Lodging or Rooming Houses are defined as "buildings that provide sleeping accommodations for 16 or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants." *Id.* § 26.1.1.1.

3) Residential Board and Care Occupancies are defined as "occupanc[ies] used for lodging and boarding of four or more residents, not related by blood or marriage to the owners or operators, for the purpose of providing personal care services." *Id.* § 3.3.190.12.

In short, one- and two-family dwellings house three or fewer unrelated persons; the other uses house more than three. Notably, one- and two-family dwellings do not require an automatic sprinkler system, while the other two uses do. *See* FLA. STAT. § 633.208(8)(a).

Days after the initial inspection of the Property, the Fire Inspector conducted a follow-up inspection, concluded that the Property should be classified as a "Lodging or Rooming House," and issued a new report observing the absence of "an approved automatic sprinkler system." Doc. 54 ¶ 30 (quotation marks omitted). The new report said that the City would reinspect the Property within thirty days. Although the parties agree that reinspection never occurred, they disagree about the reason.

After the 2012 Building and Fire Code enforcement actions, the Plaintiffs' battles with the City abated for several years. During that time, they pushed to expand their business. The Plaintiffs hoped their investments would allow them to raise the residents' rents and market the home to a new group of residents -- young opioid addicts.

Some five years later, on May 5, 2017, the Fire Inspector told Bergstrom that the Property was not being used as a single-family dwelling; rather, it was either a Residential Board and Care Occupancy or a Rooming House. The Fire Inspector explained that, under either classification, the Fire Code would apply to the Property, and as a result, Sailboat Bend would have to install an automatic sprinkler system. Bergstrom estimated that a new fire sprinkler system would cost between $30,000 and $40,000.

At a July 25, 2017 hearing, the Code Enforcement Board found two Building Code violations: the building had blocked emergency escape routes; and, the Plaintiffs had performed unpermitted and un-inspected work. In a separate order, the Code Enforcement Board found ten Fire Code violations. Some of the most egregious violations included a lack of compliant smoke alarms, no fire alarm system, and no approved emergency evacuation plan. Both orders required the Plaintiffs to remedy the violations by August 22, 2017.

Five days before the deadline, the Plaintiffs' out-of-state attorney, Stephen Polin, sent an Assistant City Attorney a letter entitled "Reasonable Accommodation Request" (the "Letter"). The

Plaintiffs appeared to ask for two accommodations, both of which sought to avoid the installation of an automatic sprinkler system. As for the first "accommodation," the Letter asked the City to waive the limitations on the maximum number of unrelated persons who could reside together as a family under the Fire Code and to treat the Property as having a single-family use (to which the Fire Code does not apply). As for the second "accommodation," the Letter urged the City to "narrowly tailor[]" the Fire Code by "taking into account that the residents of Sailboat Bend are fully ambulatory, and are fully capable of responding to a fire emergency in the same manner as families and those related by blood, marriage, or adoption." Doc. 61 ¶ 27. The Plaintiffs say that the City failed to respond to the Letter. The City claims that it addressed the Letter at a public hearing.

Ultimately, the Plaintiffs satisfied both the Building Code and the Fire Code -- largely by reducing the occupancy of Sailboat Bend to only three tenants. Reducing the home's occupancy to three enabled the Plaintiffs to remedy the blocked-windows violations by providing each occupant with a sleeping room that had, besides the door, *at least* one other means of escape. As for the Fire Code, by reducing the home's occupancy to three, Sailboat Bend would qualify as a single-family home, and thereby obviate the need to install an automatic sprinkler system. *See* Fire Code § 24.1.1.2 (defining single-family home as containing "not more than three outsiders"). The Fire Inspector also required the Plaintiffs to remove Sailboat Bend's name from the Florida Association of

Recovery Residences ("FARR")'s list of certified recovery residences in order to ensure that the Property would fall within the definition of a single-family home.

The final bone of contention arose from the subsequent codification of Ordinance No. C-18-11, a zoning ordinance the City enacted on April 17, 2018. *See* Doc. 55-17 (hereinafter "Zoning Ordinance"). Under the Zoning Ordinance, residential zoning districts are (mostly) limited to families. A "family" is defined as:

> One (1) or more persons living together and interrelated by bonds of consanguinity, marriage or legal adoption, or a group of persons up to three (3) in number who are not so interrelated, occupying the whole or part of a dwelling as a single housekeeping unit, supplied with a kitchen or facilities for doing their own cooking on the premises, and who share common living facilities.

*Id.* § 6 (emphases omitted). Groups of unrelated persons may also reside in the residential zoning districts -- so long as not more than three unrelated persons live together. Groups of more than three unrelated people generally may not live in the residential zoning districts.

The City carved out an exception to the proscription that more than three unrelated people may not live together for one -- and only one -- type of group home: those that serve residents with disabilities (as the Ordinance defines them, "Community Residences"). Thus, while groups of more than three unrelated and

20-13444                Opinion of the Court                         9

non-disabled persons are barred from living together in residential zones, groups of more than three unrelated and disabled persons may live together in residential zoning districts -- so long as their homes meet other specified requirements.

A Community Residence may operate in a residential zone if it complies with the Zoning Ordinance's provisions on "Family Community Residences" (longer-term homes for the disabled) or "Transitional Community Residences" (shorter-term homes for the disabled). A Family Community Residence is:

> a type of community residence that is a relatively permanent living arrangement for more than three (3) unrelated people with disabilities with no limit on how long a resident may live in the home. The length of tenancy is measured in years.

*Id.* § 6. A Transitional Community Residence, by contrast, is:

> a type of community residence that is a temporary living arrangement for more than three unrelated people with disabilities with a limit on length of tenancy that is measured in weeks or months, not years."[1]

---

[1] The Zoning Ordinance defines a "disability" as:

> [a] physical or mental impairment that substantially limits one or more of an individual's major life activities, impairs an individual's ability to live independently, having a record of such an impairment, or being regarded as having such an impairment. People with disabilities do not include individuals who are currently using alcohol, illegal drugs, or using legal drugs

*Id.*

A licensed Family Community Residence may operate within all residential zoning districts -- *with no conditions* -- if the residence (1) houses between four and ten residents and (2) is located at least 1,000 feet from any other Community Residence. *Id.* § 5. A licensed Transitional Community Residence is also permitted within multifamily zoning districts -- *with no conditions* -- if the residence (1) houses between four and ten residents and (2) is located at least 1,000 feet from any other Community Residence. *Id.*

To help draft the Zoning Ordinance, the City retained Daniel Lauber, a city planning expert. As outlined in his report, the 1,000-foot distance requirement is intended to, among other things, prevent the clustering of recovery homes, which may interfere with their ability to foster normalization and community integration. But a Community Residence may still be allowed in a residential district, even if it fails the distance requirement, if it either (1) applies for, and receives, "reasonable accommodation" approval or (2) agrees to certain "conditional use permit requirements" -- namely, not interfering with the normalization and integration of the existing residents of any community residence and

---

to which they are addicted, or individuals who constitute a direct threat to the health and safety of others."

Zoning Ordinance § 6.

not altering the residential character of the neighborhood. Zoning Ordinance §§ 2–3, 5.

To summarize, Sailboat Bend is a sober living facility for individuals recovering from addiction. The residents are considered "disabled" under federal and city law. After a series of Building and Fire Code violations and the denial of two accommodation requests, Sailboat Bend chose to reduce its occupancy to three people rather than make the required (albeit allegedly expensive) safety upgrades to the Property, so that it would meet the City's standards for either a Residential Board and Care Occupancy or a Rooming House. Then, separate from the Code-related issues, the City passed a zoning ordinance that placed some restrictions on the ability of Sailboat Bend to operate in residentially zoned districts.

The Plaintiffs sued the City under the FHA, 42 U.S.C. § 3604, and the ADA, 42 U.S.C. § 12132, alleging that the Zoning Ordinance facially discriminated against individuals with disabilities, that the City failed to grant their request for a reasonable accommodation for an exemption from the Fire Code, and that the City intentionally discriminated against the Plaintiffs in its enforcement of the Code because of the residents' disabilities. The district court entered summary judgment for the City of Fort Lauderdale on each claim and this timely appeal followed.

## II.

We review the entry of summary judgment *de novo*, examining the evidence and drawing all reasonable inferences in the

light most favorable to the nonmoving party. *Hernandez v. Plastipak Packaging, Inc.*, 15 F.4th 1321, 1325 (11th Cir. 2021); *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1283 (11th Cir. 2006). We will affirm if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1211 (11th Cir. 2008) (citation and quotation marks omitted); FED. R. CIV. P. 56(a).

## A.

First up is the Plaintiffs' claim that the City's Zoning Ordinance facially discriminates against individuals with disabilities in violation of both the FHA and the ADA. Because the Zoning Ordinance undeniably treats individuals with disabilities *more favorably* than it treats similarly situated, non-disabled individuals, we conclude that the Zoning Ordinance is not facially discriminatory at all. We need not consider whether the differential treatment of individuals with disabilities is "justified" because the differential treatment favors them rather than discriminates against them.

We start, as we must, with the text of the relevant statutes. First, the FHA prohibits, among other things, discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2); *see also Schwarz*, 544 F.3d at 1212 (explaining that the Fair Housing Amendments Act of 1988 amended the FHA to add handicapped persons as a protected class and that the FHA

prohibits zoning actions that discriminate based on disability).  The statute also renders it unlawful to "make unavailable or deny a dwelling to any buyer or renter because of a handicap[.]"  42 U.S.C. § 3604(f)(1).  The critical language in Title II of the ADA, in turn, reads this way: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The district court, following the lead of many courts, analyzed the Plaintiffs' FHA and ADA discrimination claims as one. *See, e.g.*, *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 919 (10th Cir. 2012) (Gorsuch, J.) (analyzing both the FHA and the ADA under the same "statutory rubric"); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003), *superseded by regulation on other grounds* ("Due to the similarities between the statutes, we interpret them in tandem."); *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1364 (S.D. Fla. 2012) ("Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one.").  For our purposes, the parties do not dispute analyzing the statutes as one. Although there are important differences between them, those differences are not relevant to the outcome of this appeal.  Both the FHA and the ADA outlaw discrimination against people with disabilities.

The texts of the FHA and the ADA each require a plaintiff alleging disparate treatment to prove that he was treated less favorably than a similarly situated, non-disabled person. For starters, the text of the FHA makes it unlawful to "discriminate against" a person in housing on the basis of disability. In *Bostock v. Clayton County*, the Supreme Court recently provided meaning to the phrase "discriminating against" as it was used in Title VII of the Civil Rights Act of 1964. 140 S. Ct. 1731, 1739–40 (2020) (citing 42 U.S.C. § 2000e-2). In considering whether Title VII's proscription on "discriminating against" individuals in employment "because of such individual's race, color, religion, sex, or national origin" included firing someone for being homosexual or transgender, the Court asked what it meant to "discriminate against" a person. *Id.* at 1738–40. Interpreting that statute "in accord with the ordinary public meaning of its terms at the time of its enactment," the Court concluded that "[t]o 'discriminate against' a person [ ] would seem to mean treating that individual *worse* than others who are similarly situated." *Id.* at 1738, 1740 (emphasis added) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). In *Burlington Northern and Santa Fe Railway Company v. White*, the Supreme Court had earlier explained the meaning of the term the same way: "No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that *injure* protected individuals." 548 U.S. at 59 (emphasis added). And the Supreme Court again said the same thing in *Ricci v. DeStefano*, another Title VII case. 557 U.S. 557 (2009). "Disparate-treatment cases present the most easily understood type of discrimination, and occur

where an employer has treated a particular person *less favorably* than others because of a protected trait." *Ricci*, 557 U.S. at 577 (emphasis added) (cleaned up). Although the statute at issue in each of *Bostock*, *Burlington*, and *Ricci* was Title VII, its "discriminate against" language tracks identically the language found in the FHA, which makes it "unlawful . . . [t]o *discriminate against* any person . . . because of a handicap[.]" 42 U.S.C. § 3604(f)(2) (emphasis added).

Further, although section 3604(f)(1) of the FHA and Title II of the ADA do not use the same "discriminate against" language, their prohibitions are plainly concerned with negative treatment. First, section 3604(f)(1) prohibits "mak[ing] unavailable or deny[ing]" a dwelling to someone because of a disability. Merriam-Webster Dictionary defines "to deny" as "to give a negative answer to" or "to refuse to grant." "Deny," MERRIAM-WEBSTER'S ONLINE DICTIONARY 2022, https://www.merriam-webster.com/dictionary/deny. Similarly, Merriam-Webster Dictionary defines "to make" as "to cause to happen to or be experienced by someone." And it defines "unavailable" as "not possible to get or use." "Make," MERRIAM-WEBSTER'S ONLINE DICTIONARY 2022, https://www.merriam-webster.com/dictionary/make; "Unavailable," MERRIAM-WEBSTER'S ONLINE DICTIONARY 2022, https://www.merriam-webster.com/dictionary/unavailable. Thus, to "make unavailable" a dwelling is to deprive one of access to the dwelling. It follows that a disabled plaintiff cannot be granted *more* access to housing than a similarly situated, non-

disabled counterpart and yet still claim he was "denied" access to a dwelling or that it was "made unavailable" to him on account of his disability.

This negative treatment requirement is likewise found in the language of Title II of the ADA: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. An examination of the verbs used by Congress in the text of this section confirms this understanding. To be "excluded from," like being "denied the benefits of," has both a negative and deleterious denotation and connotation. Merriam-Webster Dictionary defines "to exclude" as "to prevent or restrict the entrance of" or "to bar from participation, consideration, or inclusion." "Exclude," MERRIAM-WEBSTER'S ONLINE DICTIONARY 2022, https://www.merriam-webster.com/dictionary/exclude. And the final phrase in the statute -- "subjected to discrimination" -- must be read in connection with its first two prohibitions. We rely on the interpretive canon of "*noscitur a sociis* -- a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). Thus, we understand Congress to have prohibited intentional discrimination that inures to the detriment or disadvantage of the protected class. A disabled plaintiff who has been treated in the same way as a similarly situated, non-disabled person, or in the rare case like this one, who has been treated better

than a non-disabled comparator, cannot successfully mount a discrimination claim under these provisions of the FHA or the ADA.

Indeed, in *Bircoll v. Miami-Dade County*, a panel of this Court observed that Title II "prohibits a public entity from *discriminating against* a qualified individual with a disability on account of the individual's disability[.]" 480 F.3d 1072, 1081 (11th Cir. 2007) (emphasis added) (quotation marks omitted). Moreover, the "Findings and Purpose" section of the ADA also declares that "[i]t is the purpose of this chapter – (1) to provide a clear and comprehensive national mandate for the elimination of *discrimination against* individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(1) (emphasis added).

If a plaintiff has made a *prima facie* showing of disparate treatment under the FHA or ADA, the burden of going forward shifts to the defendant to establish that the differential treatment is justified. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007); *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir. 1995); *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1350 (S.D. Fla. 2007). The circuit courts are split on what test to employ in deciding whether the defendant's burden of justification is met; the Eleventh Circuit has not yet weighed in on this issue.

Our sister circuits have adopted three different tests. *See generally Curto v. A Country Place Condo. Ass'n, Inc.*, 921 F.3d 405, 412 (3d Cir. 2019) (Fuentes, J., concurring) (discussing the tests

that other circuits have adopted). The first one adopts the Equal Protection Clause rational basis review test, *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996); the second employs a means-ends tailoring test, *Larkin*, 89 F.3d at 290–91; and the third has concluded differential treatment is justified when the government shows "(1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected," *Cmty. House*, 490 F.3d at 1050; *see also Bangerter*, 46 F.3d at 1503 (holding that "two potential justifications" are "benign discrimination" and "public safety").[2]

Here, the district court did not choose from among the various approaches, concluding instead that under any of them, the Zoning Ordinance adopted by the City of Fort Lauderdale was justified under the second part of the analysis because the City treats

---

[2] It is worth noting that the ordinances in the cases from the Sixth, Ninth, and Tenth Circuits all treated the protected group less favorably. *See Cmty. House*, 490 F.3d at 1046 (segregating men and women at a homeless shelter); *Larkin*, 89 F.3d at 289–91 (spacing requirement applied only to housing for individuals with disabilities, but provided no corresponding benefit); *Bangerter*, 46 F.3d at 1502 (24-hour supervision requirement applied only to disabled residents in group homes and not non-disabled residents of other group homes). Only the Eighth Circuit reached step two after concluding the plaintiffs were treated more favorably. *See Oxford House-C*, 77 F.3d at 251–52 (City of St. Louis code capped group homes for disabled people in single-family zones at eight people, but allowed only three unrelated, *non-disabled* people to reside together in a single-family zone).

individuals with disabilities better than it treats those without disabilities.

We need not reach a second step at all -- much less choose from among the various tests -- because Sailboat Bend does not even make it to first base. Although the City's Zoning Ordinance treats individuals with disabilities differently than non-disabled individuals, it undoubtedly treats them more favorably. Whereas groups of three or more unrelated, non-disabled people cannot live together in residential districts, the Zoning Ordinance specifically exempts "Community Residences," like Sailboat Bend, allowing them to operate in residential zones if certain conditions (like a 1,000-foot spacing requirement) are met. Thus, groups of three or more unrelated, *disabled* people may live together in residential districts so long as they comply with some additional requirements.

The Plaintiffs' central argument, nevertheless, is that the Ordinance does not treat individuals with disabilities more favorably because it places burdensome requirements on them that it does not place on individuals without disabilities. But this argument ignores that these "burdens" uniquely apply to individuals with disabilities because they are the only category of people who may live in Community Residences of more than three unrelated individuals and thereby benefit from the opportunity. Consider, by way of example, a city that offers free public housing only to individuals with disabilities, but to secure the housing, an applicant has to show proof of employment or a reasonable attempt at securing

employment.  No one would say that this housing program treats individuals with disabilities worse than it treats non-disabled individuals.  After all, the non-disabled could not secure free public housing at all.  Here, the Zoning Ordinance's requirement that Community Residences comply with the 1,000-foot spacing requirement applies only when the disabled seek to live together in a group of more than three -- something non-disabled individuals can never do.  Quite simply, the Ordinance does not facially discriminate *against* disabled people.   Thus, we need not and do not consider any justification for the different treatment.

Nor does our case law compel us to reach a second, justification stage in the analysis when a plaintiff fails to make a *prima facie* case of disparate treatment under the FHA or the ADA because he has been treated more favorably.  Our cases have only dealt with the other two possibilities -- that the plaintiff was treated the same as or less favorably than his similarly situated comparators -- but not the odd case where the plaintiff actually was treated better.  For example, in *Schwarz v. City of Treasure Island*, we considered a disparate treatment claim under the FHA and concluded that the claim failed because the plaintiff failed to show he had actually been treated differently than similarly situated, non-disabled people.  544 F.3d at 1216.  In *Schwarz*, a panel of this Court had no occasion to consider the unusual circumstance where disabled people were treated more favorably than similarly situated non-disabled people.  In its analysis, *Schwarz* cited to two earlier cases: *Loren v. Sasser*, 309 F.3d 1296 (11th Cir. 2002), and *United*

*Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799 (5th Cir. 1974).  In neither of them did the facts establish that the disabled person was treated more favorably than the non-disabled person.  Rather, in *Loren*, the Court addressed the circumstance in which disabled and non-disabled people were treated in the same manner.  *See also Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1130, 1138 (11th Cir. 2019) (affirming the dismissal of a complaint where plaintiff conceded he was not intentionally discriminated against on account of his disability); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1148 (11th Cir. 2014).  And, in *United Farmworkers*, the former Fifth Circuit, in binding precedent, addressing a claim of racial discrimination, faced a fact pattern where racial minorities were treated less favorably than everyone else.[3]

More recently, in *Hunt v. Aimco Properties, L.P.*, we considered an intentional discrimination claim under the FHA.  814 F.3d 1213 (11th Cir. 2016).  There, we reversed an order dismissing the plaintiff's claim because the allegations "sufficiently pled that [defendant] placed conditions on [plaintiff] that were not imposed on other residents and restricted his access to facilities in the complex that were open to other residents."  *Id.* at 1224.  Again, the plaintiff in *Hunt* was treated worse -- not better.  *See also Crane v.*

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Lifemark Hosps., Inc.*, 898 F.3d 1130, 1136 (11th Cir. 2018) (holding plaintiff provided sufficient evidence defendant intentionally discriminated against him because defendant was deliberately indifferent to plaintiff's need for an interpreter); *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017) (plaintiff alleged he was removed from his regular classroom on account of disability); *Hallmark*, 466 F.3d at 1286 (holding there was insufficient evidence to show plaintiffs' alleged worse treatment in housing was on account of race); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1191 (11th Cir. 2004) (plaintiff alleged she was fired because of her disability); *Woodard v. Fanboy, LLC*, 298 F.3d 1261, 1268 (11th Cir. 2002) (upholding a jury's finding, in an FHA intentional discrimination case, that plaintiff received worse treatment in housing on account of familial status); *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1542–43 (11th Cir. 1994) (holding plaintiffs' allegations that public housing was concentrated in Black neighborhoods stated a claim of intentional discrimination).

We agree with the district court's ultimate conclusion that similarly situated, unrelated disabled persons are treated better by the City's Ordinance than unrelated, non-disabled persons -- after all, groups of three or more unrelated, disabled persons may live together in residential zones, whereas three or more unrelated, non-disabled persons may not. We reach this conclusion directly and at the outset of the analysis. It is, therefore, wholly unnecessary to shift the burden to the City, as the district court did, or to

choose among the different justification tests under any second analytical step. As we see it, the Plaintiffs' claims fail under the FHA and the ADA at step one of any analysis.

## B.

Next, the Plaintiffs argue that the City failed to grant their reasonable accommodation request in violation of the FHA and the ADA. The Plaintiffs asked the City to waive the automatic fire sprinkler requirement. Recall that under the Fire Code, one- and two-family dwellings are exempt from the automatic sprinkler system requirement, but the City determined that Sailboat Bend was either a Residential Board and Care Occupancy or a Rooming House, and, therefore, it was required to install automatic fire sprinklers. Without an accommodation, Sailboat Bend claims it would have to raise the rents beyond the tenants' ability to pay in order to come up with the $30,000 to $40,000 needed to install the sprinkler system. The district court granted summary judgment to the City because, on the record evidence adduced, no reasonable juror could determine that the requested accommodation was "necessary." The Plaintiffs offered no evidence to show that their tenants' disabilities in any way *caused* their inability to afford higher rent. We agree.

> The ADA makes unlawful a defendant's
>
> failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to

individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).  Similarly, the FHA proscribes a defendant's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]"  42 U.S.C. § 3604(f)(3)(B).

We've held that to prevail on a failure-to-accommodate claim, a plaintiff must prove:

(1) that he is disabled, (2) that he requested a reasonable accommodation, (3) that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy a dwelling, and (4) that the defendant refused to make the requested accommodation.

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019) (cleaned up); *see also Cinnamon Hills Youth Crisis Ctr.*, 685 F.3d at 919.  The City moved for summary judgment on the reasonableness and necessity prongs.  The district court avoided answering whether the accommodation was reasonable because it found that it was not necessary under this Court's precedents.

20-13444                Opinion of the Court                25

The necessity element focuses on the relationship between the requested accommodation and the plaintiff's disability. The accommodation must (1) actually alleviate the effects of the plaintiff's disability and (2) address the needs created by the plaintiff's disability. *Schwarz*, 544 F.3d at 1226. This Court has clarified what it means for an accommodation to address the needs "created by" a disability. In *Schaw v. Habitat for Humanity of Citrus County, Inc.*, the plaintiff, a quadriplegic, did not meet Habitat for Humanity's minimum-income threshold. 938 F.3d at 1262–63. In his request for an accommodation, he asked the organization to include in his income computation either the amount he received in food stamps or a letter that documented the financial assistance he received from his family. *Id.* The district court held that "because the requested accommodation went solely to [the plaintiff's] financial condition -- not his disability, it wasn't 'necessary' within the meaning of the [FHA]." *Id.* at 1270 (quotation marks omitted). A panel of this Court reversed, finding this "too simplistic an explanation." *Id.*

Instead, we took a more expansive view of the term "necessary." We held that an individual's inability to pay *can* render an otherwise-reasonable accommodation necessary, so long as "there is some causal relationship" between the disability and the inability to pay. *Id.* at 1271. The proper inquiry is whether a plaintiff's inability to work -- and therefore to make enough money to afford a rent increase -- is caused in some way by his disability (here, addiction). *Id.*

Even with the benefit of a more capacious definition of "necessary," the Plaintiffs have adduced no concrete evidence that their residents' addiction has some causal tie to their inability to afford a rent increase. The Plaintiffs attempt to prove that their residents typically have low incomes and that some residents, such as R. William Von Sydow, could not afford a substantial rent increase. But even assuming this to be true, a reasonable juror still could not conclude, based on the scant record, that the residents' disabilities are the reason for their low incomes.

The Plaintiffs insist that they've introduced enough evidence to establish a causal link and survive summary judgment. But the only evidence we can find is in one line drawn from a two-page affidavit offered by a single resident, Von Sydow, who avers at the highest order of generality that "[l]iving at Sailboat Bend Sober Living's residence has had an ameliorative effect on my disabling addiction, which previously precluded me from caring for myself, holding employment, or paying bills." Doc. 61-13 ¶ 7. This is not nearly enough to create a genuine issue of material fact. There is not the slightest information about what this resident earned before becoming disabled or whether he lived independently or paid rent before becoming disabled, or anything else. *See Schaw*, 938 F.3d at 1271. And the Plaintiffs have offered nothing about the rent-paying capabilities of any other resident at any time over the past fourteen years the facility has operated in the City of Fort Lauderdale. Nor have the Plaintiffs explained how any disability may have caused an inability to pay more rent, or for that

matter, any rent at all.  Nor, more generally, have they offered anything about any correlation or connection between addiction and earning capacity.

The scintilla of evidence these Plaintiffs point to is insufficient to carry their burden or create a question of fact for the jury. Thus, we need not address the "reasonableness" prong of the reasonable accommodation analysis today.

## C.

Finally, the Plaintiffs claim that the City (through Fire Captain Kisarewich) intentionally discriminated against them on account of the tenants' disabilities when it decided to enforce the Fire Code against them.  Again, the district court granted summary judgment to the City because the circumstantial evidence presented was "so slight, so innocuous, so meager that no reasonable jury could use it to find that the City intended to discriminate against Sailboat Bend *because of* its tenants' disabilities." Doc. 96 at 48 (emphasis in original). We agree.

To prevail on an intentional discrimination claim, a plaintiff must show that his disability played some role in the defendant's action. *See Hallmark*, 466 F.3d at 1283.  Disparate treatment may be proven using either direct or circumstantial evidence. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Cinnamon Hills*, 685 F.3d at 919.

Direct proof of discriminatory animus involves "evidence, which if believed, proves existence of [the] fact in issue without

inference or presumption." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (cleaned up) (quoting BLACK'S LAW DICTIONARY 413 (5th ed. 1979)). So, for example, if a city official "makes discriminatory comments about the disabled while explaining his basis for the contested decision, that is direct evidence of discrimination." *Cinnamon Hills*, 685 F.3d at 920. The district court found that the Plaintiffs did not pursue a direct proof claim and that there was no direct evidence of discrimination. The Plaintiffs say this finding is not supported by the record, "where there are admissions of the Fire Marshal and the testimony of Sailboat Bend." But there is nothing in the Fire Marshal's deposition that would constitute direct proof of discrimination, and they have offered nothing at all from anyone at Sailboat Bend on this point.

As for circumstantial evidence, we employ the burden-shifting framework provided by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). This requires a plaintiff first to make a *prima facie* case of discrimination. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n.6 (11th Cir. 1993). In assessing whether a plaintiff has established a *prima facie* case of discrimination, we employ the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*. *See* 429 U.S. at 266. Among these are: (1) "discriminatory or segregative effect"; (2) "historical background"; (3) "the sequence of events leading up to the challenged actions"; and (4) "whether there were any departures from normal or

substantive criteria." *Hallmark*, 466 F.3d at 1283 (quotation marks omitted).

The first factor focuses on the effect of the government's decision. In assessing this factor, we look to whether the city's decision, though neutral on its face and as applied, has a "disparate impact" on individuals with disabilities. *Id.* at 1285–87. The Plaintiffs conceded in district court that they were not offering proof of a disparate impact on people with disabilities. Doc. 96 at 40. Nor have they offered any statistical evidence on this point, or indeed, any evidence that the City applied the Fire Code to their home, but failed to apply the same Code to some other category of similarly situated homes.

The Plaintiffs say, nevertheless, that the City reclassified its property to a Residential Board and Care Occupancy *because* of the residents' disability, thereby making the Fire Code applicable. But the Plaintiffs have offered no remotely convincing evidence on this point. The reason the City reclassified the property is because it determined that the home operated as a Residential Board and Care Occupancy, rather than as a single-family home.

The Plaintiffs next point to the fact that the City ordered Sailboat Bend to remove itself from FARR's website. But, again, Sailboat Bend does not -- and cannot -- explain why we should view this request as evidence of discrimination on the basis of disability. Instead, it is explained by Sailboat Bend's *voluntary* decision to reduce its occupancy to three residents in order to qualify as a single-

family home and thereby avoid complying with the important safety requirement that an automatic sprinkler system be installed.

Finally, the Plaintiffs fault the district court for ignoring "that the Fire Code does not apply to one- and two-family dwellings." The district court disposed of this argument simply:

> The Fire Code applies to the Property *only* because its residents -- disabled or not -- are a group of more than three *unrelated* persons living together. *See* Fla. Stat. § 633.208(8)(a). The Fire Code's application thus has nothing to do with the tenants' disability.

Doc. 96 at 42. We agree.

The second *Arlington Heights* factor looks to the historical context of the challenged actions. The district court found that the Plaintiffs had provided no relevant historical context and the Plaintiffs do not challenge this finding on appeal.

The third factor looks to "the sequence of events" preceding the challenged actions. In applying this factor, we often consider evidence of community animus preceding a government's actions. *See Vill. of Arlington Heights*, 429 U.S. at 267; *see also Caron Found.*, 879 F. Supp. 2d at 1369 (finding support for intentional discrimination where "[c]ommunity outrage erupted" after a sober home "applied for a reasonable accommodation"). The Plaintiffs claimed that the City's decision not "to respond or even acknowledge the reasonable accommodation request sent to the City" evinces an intent to discriminate. Doc. 96 at 44 (quotation

marks omitted). But the City did discuss the letter at a public meeting.  The Plaintiffs do not press the point as evidence of intentional discrimination on appeal.

The Plaintiffs also complained that after the City required them to remove the central AC unit and required the installation of window AC units, the City then cited the Plaintiffs for violating the Fire Code by blocking emergency escapes with the same window AC units.  The district court discounted this argument, too, because it was Sailboat Bend's own choice (1) to install window AC units instead of a compliant central AC system, and (2) to place the window units in a location that violated the Fire Code.  Once again, the Plaintiffs do not press the point on appeal.

The fourth and final factor asks whether the City deviated from its ordinary practice.  As for this factor, we have said that "procedural abnormalities are only relevant within a larger scope." *Hallmark*, 466 F.3d at 1285 (quotation marks omitted).  The Plaintiffs point to the deposition of Fire Captain Kisarewich, who testified that, when the building inspectors contacted the fire inspectors about the Plaintiffs' enterprise in 2017, he "[w]as a little surprised" because "it was a single-family residence and normally [they] would not have a fire account at a single-family residence."  Doc. 55-7 at 29:22–25.  As the district court noted (and the Plaintiffs do not dispute this on appeal), Kisarewich did not know Sailboat Bend was not operating as a single-family residence when the fire account was opened.  Of course he would have been surprised,

precisely because the Fire Code does not apply to single-family dwellings.

Finally, the Plaintiffs again raise that the Fire Inspector insisted that Sailboat Bend remove its name from the FARR-certified list if it wanted to be classified as a single-family dwelling. Even if this were a deviation from standard procedure, it is clear that, when viewed within the "larger scope" of the record, removing itself from the FARR-certified list actually *helped* Sailboat Bend avoid further enforcement action because it could operate as a single-family dwelling, rather than as a Residential Board and Care Occupancy.

The sum of the Plaintiffs' evidence, then, is that the City cited Sailboat Bend for a violation of the Fire Code after the City made the facility remove its central AC unit and asked the facility to remove its name from the FARR-certified list because it was operating as a single-family dwelling. Even when viewing the evidence in the light most favorable to the non-movant, this is an insufficient evidential foundation to establish that the residents' disabilities played some role in the City's decision to enforce the Fire Code against the Plaintiffs.

We **AFFIRM**.