[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10773

_____

VISION WARRIORS CHURCH, INC.,

Plaintiff-Appellant,

*versus*

CHEROKEE COUNTY BOARD OF COMMISSIONERS,

Defendant,

HARRY JOHNSTON,
STEVE WEST,
RAY GUNNIN,
BENNY CARTER,
COREY RAGSDALE,
both individually and in their official capacities as

members of the Cherokee County Board of Commissioners, et al.,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03205-MHC

————————————

Before ROSENBAUM, LAGOA, Circuit Judges, and SINGHAL,⋆ District
Judge.

SINGHAL, District Judge:

Vision Warriors, a residential ministry and the Plaintiff-Appellant in this case, purchased property in Cherokee County, Georgia, to operate its faith-based substance abuse rehabilitation center for men. Vision Warriors' intended use was not entirely novel. Prior owners of the property, the Happy Acres Mission Transit Center ("Happy Acres"), operated a dormitory on the premises and received assurances from the then-zoning administrator that Vision Warriors could do the same.

————————————

⋆Honorable Raag Singhal, U.S. District Judge for the Southern District of Florida, sitting by designation.

Defendants-Appellees, the Cherokee County Board of Commissioners and its members ("the County"), initially granted, then revoked, authorization to house individuals on the property and denied Vision Warriors' requests for zoning approval. Appellant challenges the actions of the County Board of Commissioners and its members under the Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), Equal Protection Clause of the Fourteenth Amendment, Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and on Georgia state law grounds.

As relevant to this appeal, Appellees jointly moved to dismiss the RLUIPA claim, and the district court ruled in their favor. On later cross-motions for summary judgment,[1] the district court ruled in favor of the County on all remaining grounds, including the FHA, ADA, Equal Protection, and Georgia state law claims. Upon careful analysis, and with the benefit of oral argument, we affirm the district court's ruling as to all but the RLUIPA claim, which, based on intervening precedent, we remand for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL HISTORY

We begin with a review of the essential undisputed facts and procedural history. As we are reviewing an order granting summary judgment in this appeal, we present the evidence in the light most favorable to the nonmovant, Vision Warriors, and draw all

---

[1] Appellant moved for partial summary judgment.

reasonable inferences in its favor. *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1293–94 (11th Cir. 2013).

### A. Property at Issue

The property at issue in this case consists of two adjacent parcels, around 6.5 acres in total, in residential zoning districts R-80 and R-20. Tom and Jewel Young, founders of Happy Acres, held the property from 1972 until Vision Warriors' purchase on December 13, 2017. Happy Acres' mission was to "promote the recreation, health, safety, welfare, common benefit and enjoyment of missionaries and to help further aid their religious and spiritual beliefs and goals." The Youngs hosted missionaries in their home, typically "one or two a month" for "no more than a week." In 1982, Tom and Jewel Young applied to rezone the property to build a "church and facility to be able to keep missionaries in larger numbers" than they could host in their home. Cherokee County denied the application and Happy Acres decided instead to build a large church on the premises. Jewel Young testified that the initial application was denied because some neighbors spoke out against it. Cherokee County then approved the "church only" application and issued a certificate of occupancy as well as mechanical, electrical, and sewage permits.

### B. Happy Acres' Use and Transfer

Happy Acres held services, conferences, retreats, and banquets in the new building, ranging from a few to fifty-five persons. The building also housed missionaries; four families at a time "on average" and "[t]here were months when six families" stayed on the

property.  The structure featured seven rooms, a bunk bed, and three efficiency apartments.  Though Happy Acres did not charge rent, it suggested a daily payment of $15.

Happy Acres decided to sell the property in 2016 following Tom Young's death.  In late 2016, Happy Acres met with the then-Zoning Administrator, Vicki Lee.[2]  The Youngs (now Jewel Young and her son Tori) submitted a zoning certification request form to Lee, which detailed the use of the property and religious temporary housing.  Tori Young facilitated Happy Acres' discussions with the Cherokee County Board of Zoning Administrators.  Lee recounted that Happy Acres informed her of their use—housing missionaries for short periods of time—but she did not review the zoning ordinance.  Lee claimed to have no personal knowledge as to the use of the property and assumed it to be legal.

On February 6, 2017, Lee issued Happy Acres a letter deeming its temporary housing a "legal nonconforming use."  Lee explained that the property "could continue to house guests in the dormitory for short periods of time" but could not "expand the use to something different or increase the number of people served."  The next day, Lee clarified in an email that "something different" meant the property owners could not "change this to a youth hostel, housing for laborers, or halfway housing."  She added, "[u]sing the dormitory for short term stays as part of the ministry is fine,"

_____

[2] Vicky Lee's name is now Vicky Smith.  Consistent with the District Court's opinion, and for the sake of clarity, we refer to her as Vicky Lee.

but "if the previous tenants were missionaries and the new tenants are planned to be recovering drug addicts, the[n] a different zoning will be required."  On March 8, 2017, after an additional request from Tori Young for clarification, Lee issued a second certification letter and attached the North American Industrial Classification System (NAICS) code associated with the land use.  The NAICS code associated with temporary shelters listed "Shelters, battered women's; Shelters, homeless; Shelters, runaway youth; Temporary housing for families of medical patients; Temporary shelters (e.g., battered women's, homeless, runaway youth)," among others.

In the summer of 2017, Vision Warriors and Happy Acres entered into a Letter of Intent to purchase the property.  In July 2017, Young emailed Lee to request an updated letter confirming Vision Warriors' special use.  Lee assured Young that the March 8, 2017, letter was sufficient, explaining that "I am the interpreter of land use and I assure you this meets Vision Warriors['] use."  Lee issued a third certification letter to the same effect and indicated that Vision Warriors would need to seek a Tenant Occupancy Change and noted that a fire marshal would visit the property to verify the required life-safety items.  Vision Warriors completed its purchase of the property shortly thereafter.

### C. Cherokee County Administrative Proceedings

Vision Warriors moved in and began its work in December 2017 or January 2018.  In April 2018, the County fire marshal arrived on the premises and left a card or letter which prompted

Vision Warriors to meet with County employees and submit a Tenant Occupancy Change ("TOC") permit.

The County issued a TOC permit to Vision Warriors on April 20, 2018. Shortly thereafter, the Deputy Fire Marshal for the County, Chad Arp, contacted Vision Warriors to learn more about its intended use. Vision Warriors replied that it was not a "recovery or treatment center" but that it housed men formerly in recovery centers for drug and alcohol abuse and helped them get back on their feet.

On April 25, Arp relayed this information to Margaret Stallings, the County's Principal Planner, and Jeff Watkins, the County's Director of Planning and Zoning—both of whom served as the then-acting zoning administrators following Lee's retirement. Stallings instructed Arp to postpone the planned inspection of Vision Warriors' property while she gathered additional information.

Simultaneously, in the weeks following the issuance of the permit, several neighbors complained to Watkins including that "they had questions" about "[w]hat's going on, what's happening." Watkins met with the neighbors to discuss their concerns shortly before he met with Vision Warriors. A neighborhood group called "Cherokee Citizens for Community Preservation" circulated a petition urging neighbors to call upon the County Commissioners, Watkins, and Stallings to enforce the zoning code against Vision Warriors.

Throughout May 2018, County Officials and Vision Warriors continued discussions regarding Vision Warriors' use of the property. On May 9, Vision Warriors submitted a letter through its attorneys which compared its use to Happy Acres' and explained that Vision Warriors relied upon Lee's assurances in purchasing the property. On May 16, the Cherokee County Attorney advised the county to inspect the property. Shortly thereafter, Arp, the County Fire Marshal, conducted a visit with six other County employees. Though the County typically conducted courtesy site visits, Arp could not recall a site visit with as many individuals in the preceding five years.

On June 12, the County revoked Vision Warriors' TOC permit. The County determined that Vision Warriors used the property as a temporary shelter and explained "[t]emporary shelters [were not] permitted in residential districts in the County since at least 1969." The County added that Lee had issued the permit in error and instructed that all "current residents need to find alternative housing and the commercial uses of the property (to include, without limitation, the woodworking shop, the auto shop, and the import/export business) must be discontinued."

On July 11, 2018, Vision Warriors filed appeals with the Zoning Board of Appeals and the Cherokee County Board of Commissioners. On August 9, Michael Chapman, the new Zoning Manager for Cherokee County, determined that the permit was properly revoked. On September 7, 2018, Vision Warriors informed Chapman that it appealed to the Cherokee County Board of Supervisors.

One month later, in October 2018, the County updated its definitions of "parsonage," "place of worship," and "religious organization" to allow religious institutions to have temporary shelters, transitional housing, and like facilities through a special use permit so long as the facilities were provided free of cost. In November 2018, Vision Warriors submitted special use permit applications and, in the alternative, a request for rezoning to the Office and Institutional District ("OI"). Vision Warriors requested a permit for a dormitory "housing up to 55 residents."

On March 5, 2019, the County Planning Commission held a public hearing where eleven individuals spoke out against Vision Warriors' use of its property. The County Planning Commission commented that Vision Warriors' use "may not be compatible with the surrounding area" where the existing septic tank was intended for use by nine residents at most. The Commission conceded, however, that the planned use would be compatible with existing traffic patterns and the natural property barriers, if properly maintained, could mitigate any potential noise from the property.

The Commission voted on April 16, 2019, to deny the special use permit and rezoning requests. Before doing so, on March 31, 2019, Harry Johnston, the Chairman of the Board of Commissioners, emailed the "Hickory Flat Folks," a neighborhood group opposed to Vision Warriors' use, and indicated that he planned to vote against the zoning applications.

Vision Warriors appealed the Commission's determination that its use was a temporary shelter as opposed to a dormitory. The

Board of Commissioners held a hearing on July 16, 2019, with a "neutral officer" as its arbiter. Chapman testified at the hearing that Vision Warriors' use was more akin to a temporary shelter than a dormitory where the latter is tied to educational institutions. At the close of the hearing, the Board determined that Vision Warriors' use was a temporary shelter and voted unanimously to deny Vision Warriors' special use permit and rezoning request.

### D. Procedural Posture

Vision Warriors filed suit in federal court shortly thereafter against the County Defendants under the FHA, ADA, RLUIPA, and Fourteenth Amendment. Though Vision Warriors initially appealed the Commission's determination in Georgia State Court, it dismissed the litigation and filed an amended complaint in its federal suit.

The District Court dismissed Vision Warriors' RLUIPA claim upon the County Defendants' Motion to Dismiss and granted summary judgment on all remaining claims in favor of the County. In its order dismissing the RLUIPA claim, the district court relied on *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004), and found that decreasing the number of men who live on the property did not constitute a substantial burden under RLUIPA. Particularly, the district court noted that nothing in the complaint suggested that Vision Warriors could not still provide weekly services and faith-based meetings or even host six residents permanently. This appeal followed.

On January 26, 2023, the parties presented oral argument before the Eleventh Circuit. Vision Warriors conceded that it did not require hosting up to 55 persons at a time. Rather, Vision Warriors relayed that hosting 25–30 individuals at once would be sufficient. They also conceded that, under its existing zoning scheme, Vision Warriors could legally host up to eight unrelated persons at a time. Cherokee County's zoning ordinances permit four unrelated persons to stay within each of Vision Warriors' two parcels of land. The County further noted that Vision Warriors could accommodate domestic workers in addition to the eight individuals.

We agree with the district court on nearly all grounds with one important distinction—the district court's dismissal of Vision Warriors' RLUIPA claim. The district court dismissed Vision Warriors' RLUIPA claim for a failure to demonstrate a substantial burden on its "religious exercise" under *Midrash Sephardi*, 366 F.3d at 1214. Though *Midrash Sephardi* established the governing standard for determining a "substantial burden" under RLUIPA, this Court has since clarified the substantial burden inquiry in *Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile*, 980 F.3d 821, 828–33 (11th Cir. 2020). As to Vision Warriors' RLUIPA claim, we remand to the district court for reconsideration consistent with *Thai Meditation*.

## II.    STANDARDS OF REVIEW

We review *de novo* the district court's grant or denial of summary judgment, viewing all evidence and drawing all factual inferences in favor of the nonmoving party. *Pesci v. Budz*, 935 F.3d 1159,

1165 (11th Cir. 2019).  Summary judgment is appropriate where the moving party demonstrates that no genuine dispute exists over the material facts, and the moving party is entitled as a matter of law to judgment.  FED. R. CIV. P. 56(a); *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1284 (11th Cir. 2020).

## III.   ANALYSIS

We begin with Vision Warriors' federal claims and then turn to those arising under Georgia state law.

### A. RLUIPA

Vision Warriors contends that the district court erroneously applied a more exacting standard under *Midrash Sephardi*.  Vision Warriors argues that the substantial burden on its religious exercise does not need to be total or complete to establish a viable claim under RLUIPA and that the district court incorrectly assumed as such in dismissing its RLUIPA claim.

Beginning with the text of the statute, RLUIPA provides, in pertinent part, that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling interest; and (B) is the least

restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a).

This Court reads RLUIPA to impose a two-part test: A plaintiff must demonstrate (1) that they are engaged in "religious exercise;" and (2) that the land use regulation at issue imposes a "substantial burden" upon their religious exercise. *See Midrash Sephardi*, 366 F.3d at 1226. The burden then shifts to the government to demonstrate that its land use satisfies strict scrutiny, meaning that it is (3) narrowly tailored to (4) further a compelling government interest. *Thai Mediation*, 980 F.3d at 833.

Neither party disputes that Vision Warriors has alleged engagement in religious exercise. Religious exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). And, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." *Id.* § 2000cc-5(7)(B). Appellant has sufficiently alleged its status as a "non-profit ministry that seeks to provide a faith-based community for men recovering from addiction" and "help[s] men to be better Disciples of Christ, fathers, husbands, leaders and friends." This is accomplished through a "residential program, weekly services, and faith-based meetings."

Finding no issue between the parties on Vision Warriors' religious exercise, we turn now to the core dispute: whether Vision

Warriors has demonstrated a substantial burden of its religious exercise under RLUIPA as applied by this Court.

A "substantial burden" requires "more than an incidental effect on religious exercise." *Midrash Sephardi*, 366 F.3d at 1227. To constitute a substantial burden, the challenged actions should evidence a "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.* Still, "substantial" does not mean "complete, total, or insuperable." *Thai Meditation*, 980 F.3d at 830.

Vision Warriors argues that (1) the district court failed to consider that it is a *residential* ministry, such that, absent its residential program, it cannot fulfill its mission; and (2) the County did not need to effectively bar its religious exercise on the property to constitute a substantial burden. In response, the County argues that, under this Court's precedent in *Midrash Sephardi*, a "run of the mill" zoning decision does not amount to a substantial burden. Instead, the County contends that Vision Warriors is not entirely prohibited from housing its members where up to eight unrelated members are allowed on the property at a time, and where Vision Warriors did not allege that overnight residence is a "religious precept" of its mission or purpose. Vision Warriors counters that a zoning decision could impose a substantial burden under the factors outlined in *Thai Meditation*, including: (1) whether plaintiff shows a genuine need for more space; (2) the extent to which the zoning policy deprives plaintiff of viable means of religious exercise; (3) whether a 'nexus' between the coerced conduct and plaintiff's

religious exercise exists; (4) whether the decision-making process evinces any arbitrariness; (5) whether the denial was final; and (6) whether the burden was attributable to the government or self-imposed. *Thai Meditation*, 980 F.3d at 832.

Applying the factors to its case, Vision Warriors states that it has alleged a substantial burden. Passing factor one as inapplicable, Vision Warriors argues factors two and three support a substantial burden where Vision Warriors alleged that the County's actions will "effectively shut down" its ministry and a *"residential* program is an *integral and essential* part of its care for those struggling to overcome addiction." According to Vision Warriors, factors four, five, and six underscore a substantial burden where the unprecedented actions followed community opposition, the denial was final—as in, Vision Warriors requested a reasonable accommodation and exhausted the Cherokee County appeal process—and the burden stems from the County's actions.

We find that the district court, in determining that Vision Warriors failed to establish a substantial burden, applied a more exacting standard than our precedent permits. Rather than adhering to only the principles in *Midrash Sephardi*, the district court should have considered Vision Warriors' substantial burden arguments under *Midrash Sephardi* as expanded by our precedent in *Thai Meditation*.

Together, *Midrash Sephardi* and *Thai Meditation* define the contours of a "substantial burden." In the absence of a clear definition under RLUIPA, the term "substantial burden" is given its

"ordinary or natural meaning." *Thai Meditation,* 980 F.3d at 829. First, in *Midrash Sephardi* we explained that "a substantial burden is akin to significant pressure which directly coerces the religious adherent to confirm his or her behavior." 366 F.3d at 1227 (internal quotations omitted). In *Midrash Sephardi,* we determined that no substantial burden existed where a zoning ordinance excluded churches and synagogues from a business district. *Id.* at 1228. Appellants, two orthodox synagogues, argued that relocation to a permitted district would require their congregants—particularly those who are ill, young, or old—to walk farther and may prevent them from attending services. *Id.* at 1227. The steep decline in attendance, the synagogues argued, would require them to cease all operations and substantially burden their religious exercise. *Id.* Given that the synagogues could apply for a permit to operate a few blocks from their original location, we concluded that walking farther, though inconvenient, did not constitute a "substantial" burden within the meaning of RLUIPA. *Id.* at 1228.

To better illustrate a substantial burden, we cited to clear examples of what would and would not qualify as a substantial burden on religious exercise. *See id.* On one end, a mere "incidental effect" or "inconvenience" on religious exercise does not equal a substantial burden. *Id.* at 1227. On the other end, a substantial burden exists where "a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Id.* As we have clarified before, the latter form of conduct is

*sufficient*, but not *necessary* to evidence a substantial burden. *Thai Meditation*, 980 F.3d at 830–31.

In *Thai Meditation*, we vacated a district court order where it required that a regulation "completely prevent" religious activity to constitute a substantial burden. 980 F.3d at 830. Instead, we determined that "modified behavior, if the result of government coercion or pressure, can be enough." *Id.* at 831. Remanding to the district court for reconsideration, we articulated six factors for the court to examine:

(1) whether the plaintiffs have demonstrated a genuine need for new or more space—for instance, to accommodate a growing congregation or to facilitate additional services or programming;

(2) the extent to which the City's decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise;

(3) whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise;

(4) whether the City's decision-making process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around;

(5) whether the City's denial of the plaintiffs' zoning applications was final or whether, instead, the plaintiffs had (or have) an opportunity to submit modified applications that might satisfy the City's objections; and

(6) whether the alleged burden is properly attributable to the government (as where, for instance, a plaintiff had a reasonable expectation of using its property for religious exercise) or whether the burden is instead self-imposed (as where the plaintiff had no such expectation or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements).

*Id.* at 831–32.

Turning back to our case, the district court erred in its substantial burden assessment. First, in dismissing Vision Warriors' RLUIPA claim, it determined that the challenged activity would not "remove[] any possibility" that it could continue ministry operations. Finding that Vision Warriors could continue non-residential operations, such as weekly services and faith-based meetings, the district court determined that "the restriction on [Vision Warriors'] use of the Property imposed by Defendants [does] not effectively bar the use of the Property for religious exercise." But our precedents do not require a regulation to "effectively bar" or "remove[] any possibility" of religious exercise to qualify as a substantial burden. *Thai Meditation*, 980 F.3d at 831. "Whatever 'substantial' means, it most assuredly does *not* mean complete, total, or insuperable." *Id.* at 830 (citing *Roman Cath. Bishop of Springfield v. City*

*of Springfield*, 724 F.3d 78, 96 (1st Cir. 2013)).  Vision Warriors, therefore, could allege a substantial burden without shutting its doors.

Second, the district court erred in applying a more demanding substantial burden standard from the Fourth Circuit.  In a string cite, the court introduced the Fourth Circuit standard for determining a substantial burden under *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 260–61 (4th Cir. 2019).  The Fourth Circuit there held that a burden on religious exercise is substantial where "the use of the property would serve an unmet religious need, the restriction on religious use is absolute rather than conditional, and the organization must acquire a different property as a result."  *Id.*  In rendering its decision in our case, the district court noted, "[a]ssuming that Vision Warriors' use of the property would serve an unmet religious need, the restriction on its use of the Property imposed by Defendants does not effectively bar the use of the Property for religious exercise."  This is not the test from our circuit, and we have never required an "effective[] bar" on the use of property for religious exercise to find a RLUIPA violation.

The Eleventh Circuit's substantial burden inquiry does not require a Plaintiff to establish an "unmet" religious need in the community and its religious exercise need not be completely hamstrung to meet the substantial burden threshold.  *See Thai Meditation*, 980 F.3d at 833.  We therefore remand to the District Court for consideration in the first instance consistent with this opinion

and our precedents, particularly *Thai Meditation*'s nonexhaustive list of relevant considerations.

## B.  FHA and ADA Discrimination

We next consider Appellant's FHA, ADA, Equal Protection, and Georgia state law claims, which follow from a grant of summary judgment in the County's favor.

Appellant argues that the district court erred in granting summary judgment to Appellees where its "disabled" status "played some role" in the challenged zoning decisions.  Specifically, Appellant argues intentional discrimination and a refusal to make reasonable accommodations under the FHA and ADA.  We take each in turn below.  The district court analyzed the two statutes as one and we do the same for purposes of our analysis.  *see Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275 (11th Cir. 2022) ("Although there are important differences between them, those differences are not relevant to the outcome of this appeal.").

### i.  *FHA and ADA: Intentional Discrimination*

"To prevail on an intentional discrimination claim, a plaintiff must show that his disability played some role in the defendant's action." *Sailboat Bend*, 46 F.4th at 1281.  "Disparate treatment may be proven using either direct or circumstantial evidence." *Id.*  In support of its claims, Appellant points to the following as evidence that its members' status as disabled played some role in the denial of its special use permits and rezoning request: (1) its classification

as a temporary shelter rather than a dormitory; (2) neighborhood opposition; (3) the revocation of its Tenancy Occupancy Change permit; (4) the denial of the rezoning application and a special use permit; (5) Chairman Johnston's comments that he had already decided how he would vote (that is, against Vision Warriors); and (6) the fact that revocation of a permit was unprecedented. Appellant's points do not demonstrate either direct or circumstantial evidence of discrimination and, accordingly, we affirm the district court's decision. We first examine whether Appellant demonstrated intentional discrimination through direct evidence. A direct showing of discriminatory animus involves "evidence, which, if believed, proves existence of [the] fact in issue without inference of presumption." *Id.* We see no direct evidence of discrimination where County defendants offer facially neutral reasons for each challenged action and there is no additional evidence that the Board of Commissioners had anti-disability animus. Perhaps if a county official "ma[de] discriminatory comments about the disabled while explaining his basis for the contested decision," that would suffice. *See Sailboat Bend,* 46 F.4th at 1281 (citing *Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 919 (10th Cir. 2012)). But there are no explicitly discriminatory comments from county defendants (or the neighbors in opposition to Vision Warriors' operation, for that matter) on the record.

In the absence of direct evidence, we determine whether Vision Warriors established intentional discrimination under the FHA and ADA through circumstantial evidence. Circumstantial evidence involves the "burden-shifting framework provided by

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973)." *Sailboat Bend*, 46 F.4th at 1281. First, a plaintiff must establish a *prima facie* case of discrimination. *Id.* Factors instructive for determining racially discriminatory intent include: "(1) discriminatory or segregative effect, (2) historical background, (3) the sequence of events leading up to the challenged actions, and (4) whether there were any departures from normal or substantive criteria." *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284 (11th Cir. 2006).

In assessing the first factor, discriminatory or segregative effect, we must examine whether the government's actions, though facially neutral, might have a "disparate impact on individuals with disabilities." *See Sailboat Bend,* 46 F. 4th at 1282 (internal quotations omitted). Appellant argues that the County's decisions are tantamount to a "complete ban on [its] operation in all residential zoning districts in the County." But that is not the case, and Appellant has not explained how these zoning decisions and regulations disproportionately impact a disabled population, anyway.

In oral argument, the government contended that Vision Warriors could house up to eight unrelated members under the current zoning scheme. The property in question consists of two residential lots, and each lot allows for up to four unrelated individuals, plus a number of domestic workers, or Vision Warrior staff members. To the extent Vision Warriors argues that the zoning limits disproportionately impact its members due to their disability, it has not offered any statistical data or comparators in support of this factor. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201,

1218 (11th Cir. 2008) (citing *Hallmark Devs., Inc.*, 466 F.3d at 1286 ("Typically, a disparate impact is demonstrated by statistics.")). We therefore give this factor no weight.

Nor does Vision Warriors cite any background suggesting that the county has historically discriminated against disabled individuals. It instead focuses its argument on the sequence of events. To this end, Vision Warriors lists several events or circumstances which, it contends, demonstrate a discriminatory motive by the County defendants. These include neighborhood opposition, the county's revocation of Vision Warriors' TOC permit, Commissioner Johnston's statements that he decided to vote against Vision Warriors' zoning applications before the vote took place, and the subsequent denial of the zoning applications. If there is anti-disability animus to be found in the neighbors' statements, it is buried well between the lines. Indeed, in their petition, the neighbors stated, "We believe that it is the right thing to do but in the wrong location and th[ey are] going about it in the wrong way." Commissioner Johnston's statements, however frustrating Vision Warriors may find them to be, are nevertheless probative of only one member's motives. Our case law requires more to impute an unconstitutional motive to the Commission as a whole. *See Mason v. Vill. Of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001) (finding no municipal liability "unless all three members of the council who voted against reappointing [p]laintiff shared the illegal motive."). Finally, Vision Warriors' remaining frustrations understandably stem from dissonance created by Zoning Administrator Lee's mistakes. But both Lee and the County found that Vision Warriors

was a temporary shelter.  Given that temporary shelters have been disallowed in these zones since 1969, a long track record supporting the legitimacy of this reason for revoking the permit exists, and the subsequent denial of the applications and permits is not probative of anti-disability animus without something more.  Therefore, we give this factor little weight.

Finally, and as the district court acknowledged, Vision Warriors argues that the County's conduct was a departure from normal criteria.  By "departure," Vision Warriors is referring to the County Fire Marshal's phone call after the issuance of the tenant occupancy permit, the canceled inspection ordered by the County's Planning and Zoning Department, and the unannounced visit to Vision Warriors' property from the Fire Marshal and numerous County officials.  Nevertheless, departure from normal circumstances could be justified here due to the unprecedented precipitating event—Lee's erroneous certification—and nothing in the record here allows us to conclude that that was not the case.  Finding insufficient direct and circumstantial evidence of discrimination, we affirm.

### ii.  FHA and ADA: Reasonable Accommodation

We now address Appellant's reasonable accommodation claim under the FHA and ADA.  Vision Warriors argues that the district court erred in granting summary judgment in Appellees' favor where the requested accommodation was both reasonable and necessary.

22-10773                Opinion of the Court                25

Originally enacted as Title VIII of the Civil Rights Act of 1968, the FHA prohibited housing discrimination "on the basis of race, color, religion, or national origin." *Schwarz*, 544 F.3d at 1212. Congress expanded the title to include gender and, eventually, discrimination on the basis of handicap and familial status. *Id.* Subsection (f) relates to handicapped individuals and renders unlawful:

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.
>
> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that person.

42 U.S.C. § 3604(f)(1)–(2). Also pursuant to subsection (f), "discrimination includes," among other things, "a refusal to make reasonable accommodations in rules, policies, practices, or services,

when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

The district court examined only whether Vision Warriors' claim was necessary. Finding that it was not, the district court did not reach the issue of reasonableness. For the avoidance of doubt, we examine both reasonableness and necessity below. Finding that the Plaintiffs failed to demonstrate either, we affirm.

An FHA and ADA plaintiff must establish the following to state a claim for reasonable accommodation: "(1) that he is disabled, (2) that he requested a reasonable accommodation, (3) that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy a dwelling, and (4) that the defendant refused to make the requested accommodation." *Sailboat Bend*, 46 F.4th at 1280. The parties' dispute is limited to whether the requested accommodation, housing up to 55 people, was necessary and reasonable.

### a.      Reasonableness

The reasonableness of a requested accommodation is a "highly fact-specific" inquiry. *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014). An "[a]ccommodation is not reasonable if it either [1] imposes undue financial and administrative burdens on a grantee or [2] requires a fundamental alteration in the nature of the program." *Schwarz*, 544 F.3d at 1220. As to costs and administrative burdens imposed, the County admitted the accommodation would not increase traffic or parking. The

sewage system on premises, however, is only equipped to handle a maximum of 9 people. Otherwise, the County cites to no financial burdens.

Assessing whether the requested accommodations constitute fundamental alterations, however, requires closer review. In the zoning context, a proposed accommodation qualifies as a "fundamental alteration" where it would eliminate an "essential" aspect of the zoning scheme. *Schwarz*, 544 F.3d at 1221. Appellees argued just that; in particular, that allowing up to 55 persons on the property would destroy the low-density zoning scheme for the R-80 portion of the parcel. In its reply, Vision Warriors cited to a planning report which indicates that the R-80 and R-20 zones include "residential, as well as semi-public and institutional uses," such as dormitories. Appellant also argued that the requested accommodation would not require a "fundamental alteration" on Appellees' part where Happy Acres used the property to host up to 55 persons already.

Ultimately, whether Vision Warriors' request is a "fundamental alteration" is a closer question, but one that this Court need not reach. As the district court determined, and we agree, Vision Warriors' requested accommodation fails for a lack of necessity.

### b.    Necessity

To establish the necessity of an accommodation, a Plaintiff must demonstrate that the accommodation "(1) actually alleviate[s] the effects of the plaintiff's disability and (2) address[es] the needs created by the plaintiff's disability." *Sailboat Bend*, 46 F.4th at

1280.  We have explained that the necessity inquiry considers "whether the handicapped have an equal opportunity to live in the dwellings *of their choice,* and not simply an opportunity to live somewhere in the City." *Schwarz,* 544 F.3d at 1225.

Vision Warriors argues that it offered sufficient evidence to establish necessity where the requested accommodation would "contribute in a meaningful way to residents' recovery." *Schwarz,* 544 F.3d at 1227.  In support, Appellant points to the testimony of its Founder, Kirk Driskell, where he discusses the necessary components of the program, including: "(1) a family-like living environment . . . ; (2) location in a residential area far from distraction and environments that facilitate addiction. . . ; (3) affordability for residents . . . ; and (4) on site recovery meetings and religious services."  Driskell also noted that the program should be large enough for its members to find their "people," and to enable Vision Warriors to run a cost-effective program.  Although Appellant requests a "suggested donation" of $600 per month from each member, it does not screen its members for their ability to pay and does not enforce payment.

We understand that Vision Warriors requires "large enough" programs to meet its' therapeutic needs.  On this record, however, we cannot say that Appellant has demonstrated that the extra numbers will "alleviate the effects" of its disability.  *See Sailboat Bend*, 46 F.4th at 1280.

In the FHA and ADA context, the question of necessity is a limited one:  whether a plaintiff has offered evidence sufficient to

show that the requested accommodation would "affirmatively enhance [plaintiff's] quality of life by ameliorating the effects of his disability." *Bhogaita*, 765 F.3d at 1289. In *Bhogaita*, we held that plaintiff established necessity where the requested accommodation—keeping his emotional support dog within his condominium even though the pet exceeded its weight limitation—would ameliorate the effects of plaintiff's post-traumatic stress disorder ("PTSD"). *See id.* There, plaintiff introduced multiple letters from his treating psychiatrist to support his history of PTSD and the curative impact of his emotional support pet. *Id.*

By contrast, Vision Warriors does not explain why the requested 55 members are therapeutically more meaningful as opposed to the eight members it is legally permitted to house at any time. Likewise, Appellant offered insufficient evidence to show that the requested accommodation is crucial to its economic viability. We do not take issue with the basic principle that more members will likely allow Vision Warriors to collect more money, but that doesn't mean that Vision Warriors necessarily will not be economically viable with eight members instead. *See Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 785 (6th Cir. 1996) (determining that elderly members of an adult home established necessity where the evidence demonstrated that the home would not be economically viable with any fewer than nine members); *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 602 (4th Cir. 1997) (plaintiffs "presented no evidence . . . that expansion from 8 to 15 residents would be therapeutically meaningful" where plaintiffs

offered no evidence that the home would be economically viable with eight members.).

The district court properly determined that Vision Warriors' requested accommodation was not necessary under the FHA and ADA. Accordingly, we affirm.

### C. Equal Protection

We next consider whether the district court erred in entering summary judgment in favor of the County on Vision Warriors' equal protection claim. Appellant takes issue with the County's classification of Vision Warriors' use as a temporary shelter. Specifically, Appellant argues that the County treated Vision Warriors differently than Happy Acres and dormitories generally.

Under the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws," and the Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Vision Warriors brings an as applied, or "class of one," challenge, where a "plaintiff alleges not that it belongs to a protected class, but that it is the only entity being treated differently from all other similarly situated entities." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1233 (11th Cir. 2022). To prevail, a plaintiff must show "[1] that it 'has been intentionally treated differently from others similarly situated[;] and [2] that there is no rational basis for the difference in treatment.'" *Id.*

Vision Warriors contends that the County treated Happy Acres differently where Happy Acres "operated for approximately thirty years (30) without objection from the County or its residents," while Vision Warriors was banned "entirely" from operating on the property "in any capacity." In response, the County argues that they could not have treated Vision Warriors unequally because of one key distinction: the County knew of Vision Warriors' operations, whereas Happy Acres operated, as they claim, clandestinely. The County denies any knowledge of Happy Acres' activities and argues that the County "did not regulate Happy Acres the way it would have, had it known about [its] operations."

We now consider whether Vision Warriors and Happy Acres are similarly situated. This Court requires all comparators to be "*prima facie identical in all* relevant respects." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007). The County argues that Happy Acres is not similarly situated where the County was unaware of its operation as a temporary shelter. On the other hand, Vision Warriors cites various documents to support its argument that the County was aware of Happy Acres' operations. This includes building, electrical, and plumbing permits issued by the County to Happy Acres as well as testimony from Happy Acres regarding regular inspections by the fire marshal. The district court found that Vision Warriors put forth insufficient evidence to demonstrate the County's knowledge of Happy Acres' operations, and we agree.

Even though the County issued permits to Happy Acres throughout the years, these permits do not show how many people lived on the premises or for how long.  As an example, the Certificate of Occupancy, dated April 23, 1989, does not even list an occupancy limit.  And in any event, even if the County knew about Happy Acres use, it is not clear the two organizations are similarly situated anyway.  After all, Vision Warriors would have 55 people on site all the time, whereas Happy Acres usually had many fewer.  Vision Warriors has failed to establish that the County intentionally treated Vision Warriors differently from Happy Acres, and we cannot agree that Happy Acres and Vision Warriors are similarly situated.

Finally, to the extent that Vision Warriors points to dormitories in general as similarly situated, this argument has not been adequately preserved on appeal.  "This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this [C]ourt." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (internal quotation marks omitted).  Vision Warriors did not bring this argument to the district court's attention at the motion to dismiss or summary judgment stage and cannot raise it for the first time on appeal.

We therefore affirm the district court's grant of summary judgment in favor of the County on Vision Warriors' equal protection claim.

### D. Georgia State Law Claims

We next consider whether the district court erred in issuing summary judgment in favor of the County on Vision Warriors' Georgia state-law based claims. Vision Warriors sought a declaratory judgment against the County pursuant to the Georgia state constitution, which prohibits "the passage of retrospective laws" that "injuriously affect the 'vested rights' of citizens." *S. States-Bartow Cnty., Inc. v. Riverwood Farm Homeowners Ass'n*, 797 S.E.2d 468, 471 (Ga. 2017). Vision Warriors' arguments, however, are convoluted and suffer from several fatal flaws.

At the outset, Appellant argues that its use was a "legal conforming use at the time it began using the Property as a dormitory." Vision Warriors cites nothing in support of this proposition, and the record reflects the opposite. At the time of purchase, Lee issued a permit to Vision Warriors for a legal nonconforming use as a temporary shelter. The County concedes as much, though it stated that the permit was issued in error.

Next, Vision Warriors cites to Director Watkins' testimony—which he later recanted—that Vision Warriors' use was properly classified as a "dormitory" at the time of purchase. Vision Warriors seemingly claims that it incurred a "substantial change in position" in reliance upon Director Watkins' "determination." Vision Warriors does not clarify how it could have relied, at the time of purchase, upon statements made years after the fact by Director Watkins. The County argued as much in their response, but Vision Warriors did not clarify its position in its reply. To the extent Vision

Warriors argues that it was initially classified as a legal conforming use, or a "dormitory," this contention is insufficiently supported by the record.

Alternatively, we consider whether Vision Warriors is arguing that it relied upon Lee's representations to its detriment. Lee informed Appellant, albeit erroneously, that its operations as a temporary shelter constituted a legal nonconforming use. The County contends that the principles of estoppel can apply only to a governing body, such as a municipality, and not against an individual employee. Again, Appellant furnished no response to this argument. Without any argument in support of Appellant's claims, we are left with little option but to affirm the district court's entry of summary judgment in Appellees' favor.

Finally, we examine whether the district court erred in granting summary judgment on Vision Warriors' Georgia state Due Process claims. Vision Warriors seeks a declaratory judgment that the County defendants violated its rights under the Georgia Due Process Clause by denying its requested use of the property. Under the Georgia constitution, "[N]o person shall be deprived of life, liberty, or property except by due process of law." Ga. Const. Art. 1, § 1, ¶ 1. "Due process of law as guaranteed by the Federal and State Constitutions includes notice and hearing as a matter of right where one's property rights are involved." *Schumacher v. City of Roswell*, 809 S.E.2d 262, 265 (Ga. App. 2017).

Vision Warriors argues that this claim is not, as the district court determined, a "work-around for the time bar of any appeal

of the County's decision." Rather, Vision Warriors maintains that it timely filed appeals for the County's actions "each step of the way." The County counters that Appellant's claims are "undisputedly time-barred" where the O.C.G.A imposes a 30-day deadline to appeal, and Vision Warriors filed the instant case 90 days after the County's denial of its zoning applications. Vision Warriors offers no response on this point. Even assuming Vision Warriors' claims were timely, we affirm the district court's ruling. Vision Warriors failed to assert exactly which rights it has been deprived of under the Georgia state constitution. Accordingly, we find that the argument has been forfeited.

## IV.    CONCLUSION

In sum, we affirm the district court's ruling on all claims except Vision Warriors' RLUIPA claim. We remand that claim to the district court for reconsideration consistent with this opinion and *Thai Meditation*.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**